746 So.2d 193 (1999)
SUCCESSION OF Richard GATES.
No. 32,348-CA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
*194 Sam L. Jenkins, Jr., Shreveport, Counsel for Plaintiff-Appellant, John L. Gates.
Joann Gines, Shreveport, Defendant-Appellee, in pro. per.
*195 Before BROWN, GASKINS and DREW, JJ.
DREW, J.
John Gates filed a petition to set aside a 1996 donation inter vivos and testament executed by his father, Richard Gates. Following trial on the merits, John Gates' demands were dismissed. John Gates now appeals.
We affirm in part and reverse in part.

FACTS
John Gates ("Gates") is the only child of Richard Gates ("decedent"), who died on July 3, 1996. According to Gates' birth certificate, decedent was 86 years old at the time of his death. Gates was born on June 2, 1931 to the marriage of decedent and Mary Johnson Gates. This marriage ended in divorce. Decedent was then married to Lola B. Robinson Williams Gates from July 10, 1937 until her death on January 8, 1986. No children were produced during this marriage.
Decedent executed a will on March 3, 1986. Decedent made a particular bequest of $2,500 to JoAnn Gines Shepherd and four others to be divided equally. Gates was made the residual legatee and was also appointed executor. On March 24, 1992, decedent donated a home located in the Hilltop Subdivision in Shreveport to his son.
On June 6, 1995, decedent executed a will in which he disinherited Gates for failing to communicate with him for two years and bequeathed all of his property to Shepherd. There is no blood relationship between Shepherd and the decedent. Decedent is Shepherd's great-uncle by marriage, although he referred to her as his "niece" in this will and a later will and donation inter vivos. On this same date, decedent also granted power of attorney to Shepherd, naming her as his agent and attorney in fact.
On January 6, 1996, decedent executed a will in which he bequeathed his entire estate to Shepherd, whom he also appointed as executrix. Decedent next executed a donation inter vivos on January 26, 1996, donating a lot in Southern Forest Acres subdivision and all improvements and buildings thereon, a 1974 Cadillac Deville and any other property he owned to Shepherd. A Notarial Affidavit of Correction was executed on July 18, 1996, changing the lot named in the act of donation from a lot in Southern Forest Acres subdivision to a lot in School Park subdivision, which was decedent's residence at 2028 Wyoming Circle in Shreveport.
On September 3, 1996, Gates filed a petition to set aside his father's 1996 testament and donation inter vivos. Gates alleged that at the time his father executed these acts, he was subject to undue influence from Shepard and was physically and mentally incapable of understanding the nature and effect of his acts. Gates further alleged that: (i) Shepherd held herself out as decedent's niece even though no blood relationship existed between them; (ii) Shepherd would not allow him to communicate with his father; (iii) Shepherd instructed others not to share information with him regarding his father's health; (iv) decedent lacked the physical and mental capacity to understand the nature and effect of a power of attorney he drafted on June 6, 1995, naming Shepherd as agent and attorney-in-fact to handle his personal and business affairs; and (v) Shepherd used the power of attorney to possess, conceal and convert decedent's property for her own use. Gates also prayed for an accounting of all property received by Shepherd on behalf of or from decedent.
The trial court rendered judgment dismissing Gates' demands on September 1, 1998. The judgment stated, in part:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that based upon the credible evidence accepted by this court the following findings of fact are established by this record: ...
7) that Mr. Gates' treating physician A.R. Ebrahim, testified that Mr. Gates *196 was mentally competent at the time these instruments were executed, although by January 22, 1996, he had been diagnosed with terminal cancer;
8) that for a number of years prior to his death, Richard Gates had relied upon the advice of JoAnn Gines both professionally and personally, in both financial and personal matters;
9) that for many years prior to his death, Richard Gates was cared for and attended to by JoAnn Gines, both with respect to his medical needs and financial affairs;
10) that the neighbors of Richard Gates testified at trial that Mr. Gates was close to and relied upon JoAnn Gines Shepherd for support and advice, and that it was his desire that all of his property be left to her at his death;
11) that the record presented establishes that Richard Gates did not wish for his son John Gates, who is over the age of 23 and not subject to any of the requirements mandating forced heirship, to inherit any property from him at the time of his death[.] ...
The trial court concluded that the power of attorney and the January 1996 donation inter vivos and last will and testament were in proper form, valid and enforceable. The court further concluded that "there is insufficient evidence to establish that [Shepherd] exercised undue influence in the form and to the extent necessary under Louisiana law, to invalidate either the Power of Attorney, the Act of Donation, or the Last Will and Testament of Richard Gates[.]".

DISCUSSION

Evidence to be Considered
Gates states in his second assignment of error that the trial court committed manifest error by considering Shepherd's evidence that had been ruled inadmissible at trial. We consider this assignment first because it is relevant to our inquiry of whether the trial court's factual findings were clearly wrong.
Gates propounded interrogatories which were served on Shepherd on October 4, 1996. These interrogatories sought information concerning decedent's assets and the records of his financial activities. Alleging that these interrogatories had not been answered, Gates filed a rule to compel discovery and for defendant to file an accounting. An order was entered on May 19, 1997, requiring Shepherd to answer the interrogatories within 10 days from May 12, 1997. Shepherd filed objections to the interrogatories on July 10, 1997. A second order was signed by the trial court on September 29, 1997. This order stated that the "Motion to Compel is granted and the defendant-in-rule was ordered to prepare and file responses to discovery on or before May 22, 1997." The issue of sanctions and attorney fees was reserved.
A rule for contempt was filed by Gates on October 23, 1997 concerning Shepherd's failure to answer the interrogatories. Attached was a subpoena duces tecum for the production of financial documents, contents of any safety deposit box, Shepherd's original file on decedent and any insurance policies or employee benefits plan payable upon decedent's death.
Judgment on the rule for contempt was rendered on November 12, 1997. As a result of Shepherd's failure to comply with the court's May 12, 1997 order, the court ordered that "she will not be allowed to support or oppose any claims or defenses, or introduce any evidence at the trial of this matter with respect to those issues raised in the interrogatories which she has failed to answer." Shepherd was further ordered to pay attorney fees and court costs. Shepherd eventually filed an answer to the interrogatories on December 22, 1997, even though trial on the merits began on December 9, 1997.
A scheduling order was filed into the record on July 31, 1997. The parties were ordered to exchange witness and exhibit lists by October 10, 1997. Shepherd filed *197 her witness and exhibit list late, on November 26, 1997. On December 2, 1997, Gates filed a motion in limine. Complaining of Shepherd's tardy filing of her list of witnesses and exhibits, Gates prayed that the witnesses and exhibits on this list be excluded from the trial on the merits.
The trial court precluded Shepherd from calling any witnesses or introducing any evidence for her failure to timely file her witness and exhibit list. She was allowed to make a proffer. The trial court stated:
There was not a timely witness and exhibit list filed on behalf of the defense. So my ruling in that regard on the proffer has nothing to do with the sanction. My ruling is if you don't file a witness and exhibit list, you don't call any witnesses or get any exhibits at the trial. So that's separate and apart from the sanction on the discovery....
So I think the sanction has got you covered as precluding your whole case. But even if it doesn't, the failure to file a witness and exhibit list precludes you from putting anybody on....
The trial court is referring to the sanction for failing to answer the interrogatories and to the blanket preclusion for Shepherd's failure to file a witness and exhibit list.
At trial, the only witnesses called by plaintiff were himself, neighbor Jean Strickland and Shepherd. Numerous exhibits were entered into evidence by Gates. Depositions of decedent's two physicians, Drs. Ebrahim and Sastry, were marked as defendant's exhibits, although Gates' counsel suggested that the depositions be introduced as joint exhibits and agreed to allow Shepherd to introduce the depositions as defendant's exhibits. We will consider these depositions as part of plaintiffs case.
The trial court clearly considered evidence ruled inadmissible, finding:
10) that the neighbors of Richard Gates testified at trial that Mr. Gates was close to and relied upon JoAnn Gines Shepherd for support and advice, and that it was his desire that all of his property be left to her at his death;
The only neighbor called to testify by Gates was Jean Strickland. Numerous neighbors did testify as part of Shepherd's proffer.
We will consider on this appeal only the testimony of Gates, Strickland and Shepherd, all of plaintiffs exhibits and the depositions of the two physicians.

Undue Influence and Testamentary Capacity
Gates next complains that the trial court was clearly wrong in finding that he failed to establish by clear and convincing evidence that the decedent was subject to undue influence and lacked capacity at the time he executed the testament and donation inter vivos.
The capacity to donate inter vivos must exist at the time the donor makes the donation. The capacity to donate mortis causa must exist at the time the testator executes his testament. La. C.C. art. 1471. In order to have capacity to make an inter vivos or mortis causa donation, a person must be able to comprehend generally the nature and consequences of the disposition that he is making. La. C.C. art. 1477.
Gates bears a heavy burden in attempting to prove his father's lack of capacity. There is a presumption in favor of mental capacity. Succession of Dodson, 27,969 (La.App.2d Cir.2/28/96), 669 So.2d 642. A person challenging the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed his testament. La. C.C. art. 1482. Proving a matter by clear and convincing evidence requires establishing that the existence of a disputed fact is highly probable, that is, much more probable than its non-existence. Succession of Bilyeu, 28,701 (La.App.2d Cir.9/25/96), 681 So.2d 56, writ denied, 96-2868 (La.1/24/97), 686 So.2d 862.
*198 Gates also bears a heavy burden in proving that his father was subject to undue influence. He must prove undue influence by clear and convincing evidence. La. C.C. art. 1483. A donation inter vivos or mortis causa shall be declared null upon proof that the donation is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. La. C.C. art. 1479.
The issues of capacity and undue influence are questions of fact. The trial court's factual findings will not be disturbed on appeal unless clearly wrong or manifestly erroneous. Succession of Dodson, supra; Succession of Anderson, 26,947 (La.App.2d Cir.5/10/95), 656 So.2d 42, writ denied, 95-1789 (La.10/27/95), 662 So.2d 3. Reversal is warranted only if the appellate court finds that no reasonable factual basis for the trial court's finding exists in the record, and that the finding is clearly wrong on the record. Mart v. Hill, 505 So.2d 1120 (La.1987).

Hospitalizations
Decedent, as can be expected of someone his age, was not in prime physical health at the time these documents in question were executed. Gates introduced into evidence his father's hospital records from 1990 through 1996.
Decedent was hospitalized from June 12 to June 25 in 1990 for treatment of a hematuria. A cystoscopy and a transurethral prostatic resection were performed during his stay. Two years later, on December 1, 1992, decedent was brought to the hospital with complaints of weakness in his left arm and leg. Decedent had suffered a stroke, and he was also diagnosed as having chronic obstructive pulmonary disease ("COPD"). An occupational therapist reported in mid-December that decedent had cognitive problems that would require someone to assist him with "finances and with home management." Speech pathology notes from this same period show that decedent had significant weakness in memory, problem solving, organization and abstract reasoning. The speech pathology discharge summary from December 23, 1992, reflects that decedent had improved memory and orientation, increased organization and categorization skills and exhibited "functional speech, language and cognitive skills."
Decedent was hospitalized on December 22, 1993, due to respiratory insufficiency caused by exacerbation of COPD. He was also diagnosed with hypertension. Nursing notes from the afternoon of December 25th show that decedent requested a pass to go home with his daughter and was dressed in his street clothes, but then changed his mind about going home.
Decedent was admitted to the hospital on February 21, 1994, for treatment of hypertension and hypoxemia due to exacerbation of COPD. Seven days later, decedent was again brought to the hospital, this time for treatment of pneumonia with acute exacerbation of COPD and hypertension. Nursing notes from the early morning hours of March 3, 1994, show that decedent needed orientation to time and place, and he once stated that he needed to go home and get his mail.
Decedent was admitted to the hospital on January 22, 1996, for treatment of adenocarcinoma of the rectum, anemia, pleural effusion, hypertension, and COPD. A sigmoidoscopy with biopsy, a colonoscopy with biopsy and a thoracentesis were all performed between January 23 and January 25.
Nursing notes from this period in the hospital show that decedent was often found in a confused state. On the evening of January 24, nurses found decedent wearing street clothes, which he refused to remove because he claimed he was cold. Later that same evening he was found wandering the halls confused and wanting his daughter to take him home. The nurses noted that the next morning, January 25, decedent was found standing in the *199 doorway wearing his clothes and saying that his family left him and he needed a ride home. Decedent needed to be reoriented at that time. Their notes reflect that decedent was found to be confused later that day, and that he did not understand that he could not leave until his doctor discharged him. Decedent was still confused that evening, stating that he was lost and woke up alone and did not know where he was. Decedent was reoriented to his surroundings.
On January 26, the date the donation inter vivos was executed, a nurse was summoned to decedent's room at 2:30 in the morning. Decedent told the nurse, "I need for you to carry me to Doctor's Hospital. I need to see Joann Gines. She is in charge of the hospital over there." Decedent was reoriented to his surroundings. Decedent was again confused two days later, stating that he was having surgery in the morning. Decedent was found that night sitting fully dressed on the side of his bed, disoriented as to time and place. Decedent had intermittent confusion, and needed to be reoriented to time, place and situation the next night. On the evening of January 30, decedent was found in the hall in a confused state saying, "Where am I? I should be at Dorothy's house." Three hours later, decedent was found fully dressed in his street clothes.
Decedent was admitted to the hospital on March 11, 1996, for a right-sided pleural effusion and treatment of his rectum cancer. While there, a pleural biopsy and a thoracentesis were performed. The Patient Admit Profile stated that decedent was oriented to person only. The nurses noted on March 11 that decedent was discovered in bed with his clothes off. The next day, nurses found decedent out of bed and wearing his street clothes. Decedent was very confused, and he stated he wanted to go downtown to see some friends. Later on March 12, decedent got completely dressed, including hat, and was ready to go home.

Treating Physicians
Dr. A.R. Ebrahim, who practices internal medicine and is a disability consultant, had been decedent's physician since 1986. Decedent came to his office on January 22, 1996 complaining of significant weight loss and shortness of breath. Decedent had a large amount of fluid in his lungs, and a rectal exam revealed a large mass. Suspecting decedent had rectal cancer, Dr. Ebrahim had his long-time patient admitted to the hospital.
Dr. Ebrahim found that decedent's physical condition had deteriorated significantly since he had last seen decedent on August 4, 1995. While decedent was diagnosed with obstructive lung disease during this August visit, he told Dr. Ebrahim that he did not want any treatment and that he would return in a few weeks if his condition worsened. Dr. Ebrahim advised decedent to take all of his medicine. Decedent did not return until January 22.
Dr. Ebrahim recalled that decedent was a very sick man on January 22, 1996. Decedent was anemic and had chronic heart failure secondary to emphysema. Dr. Ebrahim observed that decedent was unable to understand what was wrong with him. Dr. Ebrahim remarked that decedent was also unable to "grasp the fact" that surgery was the recommended course of treatment, and that he did not understand what surgery meant. Decedent refused to have surgery and the hospital staff had difficulty getting him to accept transfusions to raise his hemoglobin level. He eventually agreed to undergo radiation therapy.
Dr. Ebrahim related that decedent's disorientation and confusion at this time were caused by a combination of his anemia, heart failure, hypertension, emphysema, previous stroke and the fact the cancer had spread to his lower abdomen. Together these afflictions caused "tremendous confusion, disorientation and a total unawareness of his environment." Dr. Ebrahim could not determine when decedent had gone into heart failure, but remembered *200 that decedent had previously suffered from heart failure. Dr. Ebrahim agreed that decedent probably had the complaints which caused him to come to his office on January 22, 1996 for about three to six months prior to then. He presumed that no changes in decedent's demeanor were recognized during the August 1995 office visit because no changes were indicated in his records.
Dr. Ebrahim acknowledged that decedent had periods of clarity. Dr. Ebrahim, who saw decedent on a daily basis while he was in the hospital, explained that at times decedent would be confused and disoriented, while at other times he would be lucid and clear as to where he was. Decedent's mental condition improved as his anemia was treated because more oxygen was reaching his brain. Treating the heart failure also helped his mental condition. Dr. Ebrahim found decedent to be alert the last time he saw him on February 9, 1996. This was after decedent's hemoglobin had been raised, his radiation therapy had started and his heart failure had cleared up. Patients with heart failure, emphysema and anemia have inadequate oxygenation to the brain. This condition worsens at night, thus, these patients will become more confused and disoriented at night.
Dr. Ebrahim explained that disorientation is also a problem with many elderly patients, because when they are taken out of their familiar home environment and brought to a hospital, they become disoriented and want to go back home. Elderly patients will also get dressed and wander around a hospital because they do not wish to stay in the hospital.
Dr. Ebrahim referred decedent to Dr. Indira Sastry for treatment of pulmonary pleurisy on his right side. Dr. Sastry, an internal medicine physician specializing in pulmonary medicine, first saw decedent in her office on March 8, 1996. Dr. Sastry treated decedent until his death. Recalling her first meeting with decedent, Dr. Sastry described decedent as looking chronically ill, but that he was able to walk and was well-dressed. She also remembered that decedent "seemed to know very much what was happening with him, and he was aware of everything." Decedent appeared to understand what Dr. Sastry was telling him.
Dr. Sastry observed decedent after he was admitted to Doctor's Hospital in March of 1996. Decedent appeared aware of what was occurring at this time, and he understood what Dr. Sastry had explained to him about the procedure that was to be performed. Decedent was also able to sign his own consent form for the procedure. Dr. Sastry never had any doubt about decedent's ability to sign his consent form, as he appeared to be competent and understood the procedure to be performed. Dr. Sastry did not find the need to conduct a mental-status examination when she first saw decedent on March 8th.

The Son
John Gates, decedent's only child, has lived in Richmond, Virginia since 1984. Born in Shreveport, he moved to Houston with his mother when he was 10 or 11 years old, but he would spend summers with decedent. He came to Shreveport after being discharged from the military in 1955, but he did not live with his father and step-mother at this time. Gates moved back to Houston in 1956. After five more years in Houston, Gates moved to Los Angeles, where he remained until moving to Virginia in 1984.
According to Gates, he lived in Shreveport off and on between 1988 and 1992. He spent a total of two years in Shreveport, but not for a continuous period of time. He once stayed for six months, and another time he stayed for a year. He testified that during this time he had daily contact with his father. Gates acknowledged that he never gave up his home in Virginia. After decedent was hospitalized in 1990, he wanted his son and daughterin-law to spend more time with him. Decedent donated a home to Gates in 1992 so *201 Gates and his wife could visit decedent and help take care of him. Gates also remembered staying in Shreveport for a few months in 1994.
Gates described his relationship with his father as normal. He testified that he spoke with his father on a daily basis and visited with him when in Shreveport. Gates insisted that he came to Shreveport often because he was concerned about his father's physical and mental welfare. He testified that there was never a two-year period in which he did not communicate with his father.
Gates visited his father twice in the hospital in January 1996. Decedent seemed disoriented and did not appear to understand his condition. Based on his father's condition at that time, he did not think his father would have understood the significance of his actions when he signed the 1996 donations. Gates had difficulty getting information about his father's condition at this time because Shepherd had given instructions to hospital staff that Gates was not to be given any information. Admitted into evidence is a January 30, 1996 letter to Shepherd from local attorney Armand Roos on behalf of Gates. Roos, writing that Gates needed his father's medical information for his own personal medical history, asked Shepherd to provide Gates with this information. Roos also requested any financial records dealing with decedent.
Gates testified that his father was upset with Shepherd and that his father "indicated" that Shepherd had assumed too much authority. Gates also testified that his father told him he was taken someplace after being discharged from the hospital in February 1996, but his father did not know where he was brought. His father also told Gates that he could not remember things.
Shepherd controlled access to Gates when he was in the hospital in March 1996. A Physician's Order Sheet dated March 12, 1996, states that decedent's "niece" does not want certain neighbors to see decedent. The Patient Admit Profile states that Jean Strickland is not allowed to visit.
Gates testified that decedent would leave his house keys for him with a neighbor. In April of 1996, he was staying at his father's home when Shepherd called the police to have him removed, even though he testified that he was there with his father's permission.
After decedent was again hospitalized in March of 1996, Gates took an attorney with him to see his father in the rest home. Gates testified that his father had expressed to him that he wanted to remove power of attorney from Shepherd, and give power of attorney to Gates. Gates was unsuccessful in his endeavor because of his father's mental condition at the time.
Gates learned of his father's death when he received a phone call from Mrs. Irene Knighten, a friend of his father. Shepherd called with the news four hours later. Gates related how he was absent from his father's funeral because he did not know when it was going to be held and because he had pending medical appointments. Gates testified that he was suffering from cancer and heart disease at the time of his father's death.
Gates explained that Shepherd had told him the funeral was going to be on a Saturday and that she would call back to confirm, but that she never called him back to confirm the funeral arrangements. He admitted that he did not call Shepherd or Knighten about the funeral plans even though he had their phone numbers. We particularly note the following testimony by Gates:
Q: Was there any reason why you didn't call to find out about the final arrangements when no one called you?
A: I felt like they should have called me and let me know.
Q: But since they didn't and this was your father, you didn't feel a need to call them or call someone and find out when your father would be funeralized?

*202 A: No, I didn't feel that need, because they didn't have the need to let me know when he was sick. In ten years they never called me and let me know when he was ill.
Gates commented that the 1996 donation inter vivos was not characteristic of his father's habits in managing his property. He described his father as being independent and wanting to do things alone.

The Neighbor
Jean Strickland was decedent's nextdoor neighbor. She first moved into decedent's neighborhood in 1967, left in 1976, then returned in 1982. Strickland would assist decedent in the handling of his affairs. She began paying his bills in 1995 after decedent had received his utility bill, put it away and forgot about it, and his power was turned off. Decedent would bring his mail to her so she could read it and explain it to him. She ceased paying decedent's bills when she noticed checks in his register that she had not written and questioned decedent about it, but he did not know anything about the checks. When she called Shepherd to make her aware of this, Shepherd told her that she no longer needed to pay his bills for him. This conversation with Shepherd took place in the latter part of 1995.
Strickland remembered that in 1995 decedent told her that Shepherd wanted him to sign some papers so they could go into the restaurant business. Decedent also once showed her some property in Keithville and explained how he had sold it to Shepherd because she kept bothering him about it. After decedent was released from the hospital in January 1996, he told Strickland that Shepherd had been at his house taking inventory and acting like she was his mother.
Strickland visited decedent in the hospital in January 1996. Decedent recognized her and was happy to see her. Strickland recalled how she was told by the hospital staff that Shepherd had given them orders that she was not allowed to visit decedent. When she got up to leave as requested by the staff, decedent asked her why she was leaving. When she told him the reason, he responded that Shepherd was not his mother and could not tell him who his visitors could be. Strickland believed that Shepherd wanted to isolate decedent from his friends and neighbors.
Knowing that decedent was conservative with his money and how much he cared about his home, Strickland could not understand why decedent would give everything he owned to Shepherd. She knew decedent very well as he would often come to her house to eat. Strickland could not recall decedent ever specifically telling her that he did not want Gates to have anything after he died. Regarding the relationship between Gates and decedent, Strickland testified:
Like I said before, Mr. Gates was kind of hard. He was tight and hard. He has told me a lot of things, "Johnny Boy's got a head of his own." But by the same token, he's talked about [Shepherd] the same way. I mean, he's just that type of person.
Strickland recounted how, after Mrs. Gates' death in 1986, decedent attacked her one night when she was coming home. Strickland had a peace bond sworn against him. The parties went to court and were ordered not to say anything to one another for a period of time. Strickland described the court proceeding as being "very nasty." Shepherd represented decedent on this matter. Strickland described decedent as overall a good neighbor, but that he was mean and told her off a lot of times. Still, she considered herself his close friend.
Strickland did not attend the funeral because she never knew what the funeral arrangements were. She recalled that none of the neighbors discussed it with her. She testified that she called Shepherd several times to find out about the funeral, but each time Shepherd would hang up the phone.

*203 The Niece and Legatee

Shepherd is the great-niece of decedent's wife Lola Gates. While she attended Northwestern State University from 1969 to 1974, she would often stay at the home of decedent and his late wife. Even after Lola Gates' death in 1986, she still maintained a close relationship with decedent. She and decedent would often eat lunch together. Shepherd would call him every night to check on him if she was in town. She would also escort him to his doctor visits and to the hospital. Decedent called her "Baby Sis."
Shepherd has performed numerous legal services for her late great-aunt and uncle. She handled the 1986 succession of Lola Gates. She notarized decedent's March 1986 will and the 1992 donation of property from decedent to his son. Gates and his father both trusted Shepherd to be their legal representative. Shepherd recommended her friend, attorney Billy Casey, to decedent. Casey notarized the power of attorney, the 1996 will and donation inter vivos. Decedent told Gates that Shepherd would bring him food and was taking care of his bills.
Shepherd testified that even though Dr. Ebrahim and the social workers at Doctor's Hospital told her in February 1994 that it was risky for decedent to be living alone at home, decedent was very independent and did not care what the doctors or anyone else told him to do. If he felt like doing something, he was going to do whatever he wanted to do. Shepherd explained that the reason decedent executed the power of attorney was to ensure that if anything happened to him, he would have someone responsible to take care of his affairs.
Shepherd recalled that after Lola Gates's death, decedent tried to become closer to his son. Decedent added his son's name to one of his bank accounts in 1987. Shepherd testified that Gates later wrote a large check on his father's account. Shepherd further testified that upon learning what his son had done when receiving his bank statement, decedent became angry and closed the account, stating that he knew he could not trust his son. According to Shepherd, decedent did not like his son staying with him for a long period of time because decedent kept his home in immaculate condition, while his son was sloppy.
Shepherd agreed that decedent had lost about 15 pounds between his August 1995 visit and his January 1996 visit with Dr. Ebrahim. She began noticing the weight loss after Thanksgiving and wanted decedent to see his doctor in December. Shepherd explained that no one was hired to care for decedent between the August visit with Dr. Ebrahim and January 22, because decedent would not allow anyone to come to his home to assist him. Shepherd added that decedent did not need outside help because he could depend on his family and his "girlfriends." She saw decedent frequently during this period. Shepherd recalled that Strickland was often at decedent's home. Whenever she would go to decedent's home at night, Strickland would be there. Shepherd testified that while decedent's physical health was declining in January 1996, he was still able to cook his breakfast and clean his house.
Shepherd was questioned about the circumstances surrounding four checks written on decedent's account to Ella Lewis: (i) A check for $3,000 written on January 2, 1996; (ii) a check for $350 written on January 9, 1996; and (iii) checks for $1,000 and $500 written on January 10, 1996. Shepherd stated that decedent thought Ella Lewis was his girlfriend. Shepherd explained that because decedent did not know that the checks had been written until he got his bank statement, she confronted Lewis about stealing the checks. While the checks had decedent's signature on them, Shepherd testified that the checks were not written by decedent. Shepherd also testified that she filed a complaint with the Shreveport Police Department concerning these checks to Lewis. *204 Shepherd was further questioned about why decedent would cash a $5,000 CD on December 30, 1995, and put the proceeds in the checking account from which the checks to Lewis were written. Shepherd guessed that decedent may have done this to cover the checks, but then explained that her uncle liked to keep his account at a certain balance. Shepherd conceded that decedent never discussed cashing this CD and putting it in his account and that she does not know why he did it.
Shepherd testified that she and decedent went to Dr. Ebrahim's office on the afternoon of January 22, 1996. Because Dr. Ebrahim wanted decedent admitted to the hospital immediately, Shepherd testified that she and decedent went directly from the doctor's office to the hospital. According to the medical records, decedent was admitted to the hospital around 7:00 p.m. on January 22, 1996. Shepherd denied going to the bank in the meantime.
Shepherd testified that she and decedent went to his bank on the morning of January 22, 1996. Shepherd cashed a $25,000 CD owned by decedent, $5,000 of which was put into a savings account in Shepherd's name. A $20,000 CD was purchased in Shepherd's name. This $20,000 CD was later converted into a $2,500 CD in both names, another $2,500 CD in both names, a $5,000 CD in both names, and a $10,000 CD in Shepherd's name only.
A new checking account was opened in Shepherd's name, and Shepherd added her name to decedent's existing checking account. The sum of $1,000 was withdrawn from the existing checking account and placed in the new checking account. Decedent's Social Security checks were deposited in the old checking account. Shepherd testified that decedent kept this account open to take care of expenses related to his home, such as utilities. Shepherd testified that the new checking account was opened to pay for decedent's medical expenses. If money needed to be deposited into the new checking account to cover checks, it would be withdrawn from the savings account or the old checking account.
Shepherd testified that the reason she and the decedent went to the bank and made these changes was because decedent realized his health was failing and he wanted her to be in charge of whatever he had. Decedent wanted Shepherd to have whatever he had and he wanted to put his property out of his son's reach. He did not want his son to have anything else that he owned. Decedent wanted her to have control of his assets because he trusted her. Decedent was adamant that his son not come in and try to take over, and he wanted to ensure that his son could not create any problems for Shepherd.

The January 26, 1996 Donation Inter Vivos
The trial court found that Dr. A.R. Ebrahim testified that decedent was mentally competent at the time he drafted the 1996 will and donation inter vivos. This is clearly an incorrect statement of Dr. Ebrahim's deposition testimony. While the trial court designated Dr. Ebrahim's testimony on this issue as a "finding of fact," it is in effect a reason for judgment. The trial court concluded that the will and donation inter vivos are valid and enforceable. Thus, the court's ultimate factual finding is that Gates failed to prove by clear and convincing evidence that decedent lacked capacity to make the donations at issue. An appeal lies from the judgment itself, not the reasons for judgment. Wilson v. Wilson, 30,445 (La. App.2d Cir.4/9/98), 714 So.2d 35.
In any event, we conclude the trial court was manifestly erroneous in finding that Gates did not establish by clear and convincing evidence that his father lacked capacity when executing the January 26, 1996 donation inter vivos. When Dr. Ebrahim examined decedent just four days prior to this, he found that decedent could not comprehend what was wrong with him. Decedent could not "grasp the fact" that *205 he needed surgery, and he could not understand the concept of surgery. Dr. Ebrahim described decedent's condition during this hospitalization period as one of "tremendous confusion, disorientation and a total unawareness of his environment." Apparently this confused condition cleared up when the underlying physical problems were treated. Even when decedent was repeatedly suffering from bouts of confusion before treatment allowed more oxygen to reach his brain, he occasionally had periods of clarity.
The nursing notes from this period of time are especially relevant. Between January 22, 1996 and the date the donation inter vivos was executed, the hospital's nurses reported on numerous occasions that decedent was confused about where he was. Most importantly, nursing notes establish that at 2:30 in the morning on the date the donation was executed, a nurse was summoned to decedent's room. Decedent told the nurse, "I need for you to carry me to Doctor's Hospital. I need to see Joann Gines. She is in charge of the hospital over there." Decedent needed to be reoriented to his surroundings at the time. This evidence established clear and convincing proof that decedent lacked donative capacity when he executed this donation inter vivos.

The January 6, 1996 Last Will and Testament
The trial court was not clearly wrong in finding that Gates failed to prove by clear and convincing evidence that his father lacked capacity when executing his testament on January 6, 1996. Gates does not have any firsthand knowledge of his father's condition on this date because he was at home in Virginia at the time. Neighbor Jean Strickland did not testify about decedent's condition on this specific date. Dr. Ebrahim did not examine decedent until 16 days later on January 22. Dr. Ebrahim linked decedent's confused mental state on this later date to his medical problems. Gates did not overcome the presumption of capacity.
We also conclude the trial court was not clearly wrong in finding that Gates presented insufficient evidence to establish that decedent was subjected to undue influence when he executed this will. While Shepherd had acted as decedent's attorney in the past, their relationship evolved well before that. Shepherd was obviously close to her great-uncle and his wife. Decedent had grown to depend on and trust Shepherd. His donations to Shepherd are not unusual in light of the circumstances presented by this record.

CONCLUSION
Because we find that decedent lacked capacity on January 26, 1996, we reverse the judgment in part, setting aside the January 26, 1996 donation inter vivos. In all other respects, the judgment is AFFIRMED.

DECREE
At appellant's cost, the judgment is REVERSED in part and AFFIRMED in part.