802 So.2d 660 (2000)
SUCCESSION OF William W. BURGUIERES, Sr.
No. 00-CA-147.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 2000.
*661 Steven J. Koehler Leefe, Gibbs & Koehler, Metairie, Louisiana, Counsel on behalf of Barat B. Pollingue, Executrix/Appellant.
Roger J. Larue, Jr., Metairie, Louisiana, Counsel on behalf of William Burguieres, Jr., et al., Appellees/Cross Appellants.
Court composed of Judges CHARLES GRISBAUM, Jr., MARION F. EDWARDS and CLARENCE E. McMANUS.
*662 McMANUS, Judge.
In this matter, we are asked to review a judgment declaring null an olographic will and disqualifying the will's named executrix. The issues here surround the testator'san interdict'scapacity to execute the will. For the reasons that follow, we affirm the judgment.

STATEMENT OF THE CASE
The succession in this matter was opened on November 15, 1995, with a Petition for Probate of Olographic Will and Confirm Executrix (sic) filed by Barat B. Pollingue, Appellant and surviving sister of the deceased, William Burguieres, Sr., who had been handicapped since 1964 and interdicted in 1988. Pollingue was confirmed as executrix on November 15, 1995, and on this date letters testamentary were issued; Pollingue thereafter disposed of some minor matters incidental to the succession.
On April 30, 1996, a Petition to Nullify Olographic Will and Petition to Disqualify Executrix and Attorney for Succession and Petition to Appoint Paul Burguieres as Administrator of Succession was filed (as a single pleading) on behalf of Paul, William, Jr., and Dion Burguieres, William, Sr.'s, surviving children, Appellees here.
Trial of Paul's petition was held November 9 and 10, 1998; judgment and lengthy written reasons were issued June 28, 1999. Barat Pollingue now appeals, raising the following assignments of error:
1. Since the petition for interdiction stated that the reason for the interdiction was the interdict's physical limitations, the trial court committed legal error in determining that the interdiction was a judicial declaration that William was mentally infirm;
2. Since there was no evidence at all that any influence was exerted over William when he wrote his will, the trial court erred when he found that the will was the product of legal error.
Paul, William, Jr., and Dion Burguieres, Appellees here, filed a timely answer to this appeal, and assigned as error rulings on various evidentiary issues.

FACTS
William Burguieres, Sr., died on October 18, 1995. He is survived by the three children named above, Pollingue and one other sister, and one brother. William's will had been executed on November 7, 1991; the will distributes his estate among all survivors.
In August of 1964, William had been in a very serious automobile accident that left him in a coma for several months. He subsequently underwent lengthy rehabilitation therapy for the injury and never lived on his own again. There is documentary evidence in the record indicating that as of 1982, Dr. Howard Russell, Jr., M.D., an internist who had been treating William since 1971, was of the opinion that William was "mentally incapable of caring for his own affairs."
William had been interdicted in 1988; the judgment in the interdiction proceedings decreed that William was "incapable of taking care of his person and of administering his affairs." In addition, the judgment appointed Pollingue as William's curator, and the bond executed by her pursuant to the appointment stated that the interdiction was necessary "because of physical and mental infirmities rendering Mr. Burguieres [William] incapable of caring for his own personal and financial affairs."
The following pertinent testimony regarding William's incapacity and interdiction *663 was offered at the trial in the recent proceedings.
Jerry W. Sullivan, the attorney who had represented William in the interdiction proceedings, testified that though William had not given any sign of not comprehending the interdiction proceedings, the interdiction had been undertaken because of "very serious" limitations on William's mental capacitylimitations of such severity as would have prevented him from handling his own financial affairs.
Dr. O'Neill Pollingue, Barat's husband, testified that he had known William for over fifty years. Dr. Pollingue testified that the limitations caused by William's automobile accident had been strictly physical, and that up until and during the period of time in which William had executed the will, William had been "smarter than average." Dr. Pollingue testified that William had read the newspaper every day, that he loved to read, and that he had always been "up on everything."
Dr. Howard Russell, Jr., an internist, as noted above, had begun to treat William in 1971 and continued to do so until William's death. Regarding William's head injury, Dr. Russell testified that the damage had been to the "way back part" of the brain that there were no lasting deficits to the frontal lobes. He testified that the lingering infirmity was physical, obvious only in speech and motor defects. Dr. Russell testified that William had never exhibited signs of mental incompetence and that he had never had any problems communicating with William about his medical condition or treatment. However, Dr. Russell also testified that William had become emotionally unstable as a result of the head injury and that William was, at times, "irresponsible." He testified that William's volatile emotional state, coupled with the physical handicaps resulting from the accident, could produce "frustration" on William's part, which frustration could result in inattention to such tasks as monthly bill-paying.
Barat Pollingue testified that even after his accident, William had been an "intelligent," "independent" man. However, she also testified that William had lived with their parents after his release from rehabilitative care and that she had been taking care of William's financial affairs since 1979. She had continued to do so after William had been placed in residential care and up until his death. This notwithstanding, Pollingue testified that she was "sure" that William had been able to handle his own affairs after his accident.
Dr. Robert DeTrinis, M.D., who was qualified as an expert in the field of child, adolescent and adult psychiatry, testified regarding William's head injury and the long term effects of such an injury. Dr. DeTrinis testified that there were signs immediately after William's injury that the injury would be severe and of permanent duration. He testified that an EEG done some three months after the accident was still "abnormal," and that William's post-traumatic amnesia had lasted for more than seven days, an indication that there was only a seventy-two percent chance that William would recover his pre-injury intellectual capacity. Dr. DeTrinis described William's condition as frontal lobe syndrome with possible damage to other areas of the brain, effects of which are cognitive impairment and memory deficits. He testified that disinhibitions of action and speech and emotional lability, both exhibited by William, are symptoms of frontal lobe syndrome. Dr. DeTrinis also testified that though such individuals may continue to engage in such behavior as reading magazines or newspapers, this activity is not so much an intellectual exercise as a "perseverative and simplistic" repetition of meaningless activity"just *664 moving papers." He testified that such individuals, even those who are "severely limited," can appear normal, may seem to possess the ability to engage in meaningful conversation. Dr. DeTrinis testified that though such individuals are able to write, there is no "insight" into the content of the writing: they would not understand either the "context" in which a will is written or its consequences.
Finally, though Dr. DeTrinis acknowledged that though there may have been some medical records which he had not been able to review, the records he had seen had been adequate to use in forming a reliable opinion about William's condition.
Dr. Kevin Bianchini, Ph.D., who was qualified as a clinical psychologist and neuropsychologist, also testified regarding William's injury and his capacity to execute a valid will. Dr. Bianchini testified, as had Dr. DeTrinis, that the symptoms noted early on after William's accident had indicated a very severe injury, one where "you are likely to have some residual impairments." He testified that William "would be likely to have severe residual cognitive ... problems; mental, possibly, also, emotional, neurobehavioral problems." Dr. Bianchini testified that William would have had "a number of significant, continued problems related to the brain damage." He further stated that this condition would probably have reached maximum improvement within two years after the accident. Dr. Bianchini noted, as had Dr. DeTrinis, that William's records revealed a pattern of perseverative behavior, which, he stated, is an indication of frontal systems brain damage. He also referred to notations that William had "continually" asked to be given the date by the attendants at the nursing home, which, he stated, reveals a problem in orientation,a "pretty basic capacity." Dr. Bianchini testified that William would not have understood the consequences of executing a will, "either emotionally or cognitively," that William could not have understood "even a simple, relatively simple legal document."
Finally, Dr. Bianchini testified, as had Dr. DeTrinis, that the records available were "sufficient" to support his opinions about the extent and duration of William's injuries.
Patricia Burguieres, William's ex-wife, testified that there had been significant changes in William's personality and demeanor after the accident. Patricia testified that after the accident she had seen William on several occasions downtown, crossing streets in violation of traffic signals and stuffing his pockets with trash. She testified that William had, on occasion, when he had come to visit the couple's children, emptied his pockets of the collected "garbage trash" to give to her. Finally, Patricia testified that William had been unable to recognize the children after the accident.
William Burguieres, Jr., testified at the hearing and stated that his father had been "not there" after the accident. William, Jr., also testified that William, Sr., had had trouble recognizing him after the accident, and that his father had been unable to engage in meaningful conversation ever after.
In his reasons for judgment, regarding the interdiction, the trial judge noted that the judgment itself does not state any limitationit instead decrees that William is incapable of "taking care of his person and of administering his affairs" (trial judge's emphasis). The judge also noted the fact that Dr. Russell had, by way of the letter to which we refer above, originally been of the opinion that William was mentally incapacitated. The trial judge also found that

*665 [T]he proponents of the will failed to prove by clear and convincing evidence that William Burguieres, Sr. possessed the requisite capacity to donate and that at the time that William Burguieres, Sr. executed the olographic will he was able to comprehend generally the nature and consequences of the disposition that he was making.
The trial judge made lengthy reference to the testimony of Dr. DeTrinis and Dr. Bianchini, and stated that he had given their testimony more weight than that of Dr. Russell, whom he acknowledged as the treating physician. This choice was motivated, at least partly, by suspicions about why Dr. Russell had changed his diagnosis from that made in 1988.

ASSIGNMENT OF ERROR NUMBER ONE
As her first assignment of error, Pollingue argues that the trial judge was in error to find that the judgment interdicting William in 1988 was for mental as well as physical reasons. However, we find the trial judge's ruling to be not erroneous.
Louisiana law recognizes three types of interdiction: interdiction for mental incapacity (LSA-C.C. art. 389), interdiction for physical infirmity (LSA-C.C. art. 422), and a limited interdiction, which tailors an interdiction to fit only specific, listed disabilities (LSA-C.C. art. 389.1). The trial judge found that the 1988 judgment of interdiction was for mental reasons. We agree that the record supports this conclusion.
As noted, the record contains a letter from Dr. Russell, William's treating internist, which indicated that William was mentally incapacitated. Of all the documentary evidence introduced during the recent hearing, this letter came closest in time before the interdiction proceedings. Further, the curator's bond executed by Pollingue as part of the interdiction proceedings indicates that the interdiction had been undertaken because William was mentally infirm. And finally, as noted by the trial judge, the interdiction judgment does not limit itself in any fashion, though, as noted, such limitations are possible. These facts are buttressed by the testimony offered by the two experts at the recent hearing in which they describe the catastrophic, and permanent, effects of William's severe closed head injury.
We cannot disagree with the trial judge's finding that the judgment interdicting William was necessary because William no longer possessed the mental faculties to care for himself.
This being the case, the trial judge was also correct to have placed the burden on Pollingue, at any hearing in which the validity of the will was contested, to overcome the presumption of incapacity created under the interdiction.
A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament. However, if the donor made the donation or executed the testament at a time when he was judicially declared to be mentally infirm, then the proponent of the challenged donation or testament must prove the capacity of the donor by clear and convincing evidence. LSA-C.C. art. 1482. Proving a matter by clear and convincing evidence requires establishing that the existence of a disputed fact is highly probable, that is, much more probable than its non-existence. Succession of Gates, 32-348, at 6 (La.App. 2 Cir. 10/27/99) 746 So.2d 193, 197.
To have capacity to make a donation inter vivos or mortis causa, a person must also be able to comprehend generally the *666 nature and consequences of the disposition that he is making. LSA-C.C. art. 1477. The comments to this article further explain: a person must understand "in a general way the nature and extent of his property, and his relationship to the persons who are considered to be the natural objects of his bounty, and the consequences of the disposition that he is making. In other words ... a person must have a general and approximate understanding of the nature and extent of his assets to be disposed of, and he must know what it means to make a will."
We find ample support in the record for the trial judge's finding that William lacked the capacity to execute a valid will.
Both experts who testified, both qualified as specialists in and having experience with cerebral pathology, agreed that William had shown unmistakable symptoms of what is described as "frontal lobe syndrome." Both experts stated without question that William's severe head injury would have affected cognitive functioning to such a degree that William would no longer be able to comprehend the consequences of executing a will. In addition, there was other testimony which plainly called William's capacity into question.
Dr. Bianchini testified that there had been a note on the nursing home's chart indicating that William had "continually" requested the date from the staff, which, Dr. Bianchini stated, is a sign of disorientation. Patricia Burguieres, William's exwife, testified that William had been unable to recognize his own children after the automobile accident. She testified, in addition, that she had, on occasion, seen William collecting trash, which he would offer her on his visits to see their children. William, Jr., confirmed his mother's testimony that William, Sr., had been unable to recognize him or his brother and sister after the accident.
The capacity to execute a valid will encompasses both an understanding of the nature and extent of one's assets, and an understanding of what it means to make a will. There was uncontradicted testimony that Pollingue had been administering William's financial affairs for many years before he was interdicted. All of his necessities had been supplied by her; he had been given an allowance by her. Every aspect of William's financial affairs had been controlled by someone other than him for several decades before his death.
Dr. DeTrinis testified that though William might have seemed to possess normal mental capacity, activities that seemed to indicate as muchreading newspapers, for examplewould actually have been without any meaning to William. And we note that the Civil Code recognizes this phenomenon: mentally impaired individuals may seem to possess normal faculties. Civil Code article 389 prohibits mentally deficient persons from administering their own estates, "although such person[s] shall, at times, appear to have the possession of [their] reason." So though Dr. Russell did testify that William had not exhibited signs of incapacity, we can't say that his opinion should carry more weight than that of Dr. DeTrinis, who stated that appearances notwithstanding, William had been mentally incompetent.
We agree, instead, with the trial judge, who also gave more weight to the testimony of the experts than to the testimony of Dr. Russell. As noted by the trial judge, Dr. Russell had originally found William to be mentally incapacitated; we don't see any satisfactory explanation in the record for the change of opinion. We will not speculate on why Dr. Russell changed his opinion, but do choose to give more weight to Dr. Russell's earlier opinion, rendered *667 closer in time to William's original interdiction proceedings. We are also wary of Dr. Russell's current diagnosis for this reason: while both of the experts agree on a diagnosis, Dr. Russell, an internist, offers a different opinion of the degree of brain damage caused by William's automobile accident. In addition, we note that Dr. Russell did not review the medical records from William's treatment immediately after the accident; the two experts, however, refer extensively to these records. And both testified that the record of symptoms exhibited shortly after the accident would have been a very significant factor in any diagnosis of permanent damage. Finally, we note that at least one symptom linked to frontal lobe syndrome by both expertsemotional instability had actually been observed by Dr. Russell over the course of his treatment of William.
Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is most credible. Mistich v. Volkswagen of Germany, Inc., 95-0939, at 5 (La.1/29/96), 666 So.2d 1073, 1077. The trial judge, in his lengthy reasons for judgment, chose to give more weight to the testimony of the two witnesses with more direct experience in diagnosing brain injuries and their effects. We can't dispute this finding.
The issue of capacity is a question of fact. The trial court's factual findings may not be disturbed unless there is no reasonable basis for the findings in the record. Succession of Gates, 32-348 at 6-7, 746 So.2d at 198. We see no error in the trial judge's findings on the issue of William's capacity; we agree with the judge that Pollingue failed to demonstrate by clear and convincing evidence that William did possess the capacity to execute a valid will.

ASSIGNMENT OF ERROR NUMBER TWO
As Pollingue's second assignment of error, she argues that the trial judge was in error for having found that she and Dr. Pollingue exerted undue influence over William in order to have him name them in the will that is contested here.
We do not find it necessary to address this issue. Though there was testimony from the expert witnesses that William's condition, frontal lobe syndrome, would have rendered him very suggestible, if William had no capacity to execute a valid testament, the possibility that he was unduly influenced to make specific testamentary bequests has no meaning. William did not possess the mental capacity to execute any valid will; attempts to improperly influence him would have been misdirected at an individual who could not comply with whatever suggestions anyone made. We are satisfied that William had been mentally incapacitated by his automobile accident in 1964; any testament executed after this date is null for this reason alone.

ANSWER TO APPEAL
Appellees have answered the appeal, challenging several of the trial judge's rulings on evidentiary matters. However, resolution of these issues is not necessary for a determination of Appellant's assignments of error. The record as it stands is adequate for a disposition of the issues raised by Appellant; we need not consider evidence proffered or disregard objected to testimony. Therefore, we pretermit review of these issues.
For the reasons above stated, the judgment of the trial court is affirmed.
AFFIRMED.
GRISBAUM, C.J., concurs in part; dissents in part.
*668 GRISBAUM, C.J., concurring in part; dissenting in part.
I respectfully dissent from the majority's conclusion that Mr. Burguieres lacked the capacity to execute his will. After careful review of the record, I believe that Ms. Pollingue proved by clear and convincing evidence that Mr. Burguieres had donative capacity.
As stated by the majority, because Mr. Burguieres was interdicted at the time he executed his olographic will, the proponent of the will, Ms. Pollingue, must prove, by clear and convincing evidence, that he had the capacity to make the donation at the time it was executed. La. Civ.Code art. 1482. To prove that the decedent had capacity when he executed his olographic will, Ms. Pollingue must prove that Mr. Burguieres understood generally the nature and consequences of the disposition he was making. La. Civ.Code art. 1477. Clear and convincing evidence requires the proponent to prove that the disputed fact is highly probable or much more probable than its non-existence. Succession of Gates, 32-348 (La.App.2d Cir.10/27/99), 746 So.2d 193.
Under La. Civ.Code art. 1477, mental retardation alone does not necessarily mean that a person lacks donative capacity, but it is certainly a consideration. La. Civ.Code art. 1477 comment (a). Here, the sole fact that Mr. Burguieres was interdicted does not mean that he lacked donative capacity, but it is a consideration. More important, however, is that it shifts the burden of proof to the proponent of the will to prove capacity rather than the opponent having to prove the lack thereof.
La. Civ.Code art. 1477 comment (c) states that, "[t]he donor who is capable of understanding has donative capacity even though he may not actually understand the exact instrument that he executes." Capacity is a question of fact. Succession of Gates, 746 So.2d at 198. The trial court's findings of fact will not be reversed on appeal unless there is no reasonable factual basis in the record for the trial court's finding. The appellant must prove that the trial court's findings are clearly wrong or manifestly erroneous. Id.
Several witnesses testified at trial regarding Mr. Burguieres' capacity. The medical testimony included that of Dr. Howard Russell, Jr., the deceased's treating physician, Dr. Robert DeTrinis, and Dr. Kevin Bianchini. The trial court relied on the testimonies of Dr. DeTrinis and Dr. Bianchini in making its factual findings. I find important the fact that these doctors rendered their opinions after reviewing only some of the deceased's medical records.
Dr. Russell, who treated the deceased for several years, testified that, when he explained Mr. Burguieres' condition to him, he understood and made his own decisions regarding treatment. He further testified that he found Mr. Burguieres' mentally competent but that he had physical limitations. Specifically, Dr. Russell stated, "he needed a secretary to take care of his affairs. But I think he knew very well what his affairs were and what he wanted done."
When Mr. Burguieres was interdicted, however, Dr. Russell testified and documented that Mr. Burguieres was mentally incapable of handling his affairs. Because of this, the trial court found Dr. Russell had changed his testimony to suit the desired outcome of the case and gave Dr. DeTrinis and Dr. Bianchini's opinions greater weight.
A treating physician's testimony should be accorded more weight and probative value than that of a physician who has only seen the injured party for purposes of rendering expert testimony concerning the *669 party's condition. Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La. App. 4th Cir.1993); Streeter v. Sears, Roebuck & Co., Inc., 533 So.2d 54 (La.App. 3rd Cir.1988), writ denied, 536 So.2d 1255 (La.1989). For an expert opinion to be valid and to merit much weight, it must be based on facts that are substantiated by the record. Pereira, 620 So.2d at 318; Russ v. Jones, 580 So.2d 1098 (La.App. 4th Cir.1991). The trial court's determination of an expert's credibility is entitled to great weight and should not be overturned absent manifest error. I find the trial court's decision to give Dr. DeTrinis and Dr. Bianchini's opinions greater weight than those of Dr. Russell manifestly erroneous. These two doctors never examined or evaluated Mr. Burguieres and rendered opinions based on incomplete medical records. Dr. Russell, however, treated the deceased from at least, the time he was interdicted until his death. I, thus, believe his testimony is entitled to greater weight. Finally, I would find the trial court's conclusion that Dr. Russell changed his testimony to suit the desired result erroneous. At trial, Dr. Russell explained:
He is mentally incapable of handling his affairs because of his emotional state. He was irresponsible at times, but he was competent mentally. You can be irresponsible. We all are. But we are still not mentally incompetent. He was not mentally incompetent. And what I was saying there, and if you look in the context that I said it, I said it in the same paragraph above that talking about his physical handicaps. He needed a secretary to go to the bank. He needed someone to pay his bills. He needed someone to do all these things for him, to communicate with the public. Not that he didn't know his intent. He needed someone to help him. He needed a secretary. He was mentally competent but mentally incapable of handling his affairs because of his emotional and physical impairments. I don't see where the two are incompatible.
R. p. 244. Based on the foregoing, I find that Dr. Russell's medical opinion shows that Mr. Burguieres had the capacity to execute his olographic will.
The following testimony also shows Mr. Burguieres was capable of comprehending generally the nature and consequences of the olographic will he executed. Mr. Jerry W. Sullivan, who represented Mr. Burguieres in the interdiction proceedings, testified that Ms. Pollingue took over handling Mr. Burguieres' affairs because it was physically too taxing for him to handle them. Mr. Sullivan further testified that Mr. Burguieres could mentally make the calculations and decisions but that he had very significant physical limitations. Dr. Pollingue testified that he visited and talked with Mr. Burguieres often and that he had the capacity to understand his affairs and make decisions. Ms. Patty Villani, an employee of Chateau, where Mr. Burguieres resided from 1988 until his death, testified that she saw him often, that she had conversations with him, and that she had no reason to doubt that he was a mentally capable person. The trial court, however, relied on Ms. Irma Pavon's testimony, who worked at Riverview Boarding Lodge, where Mr. Burguieres resided for four to five months. She merely testified that Mr. Burguieres was not talkative and that she thought he only looked at pictures in the magazines and newspapers because he flipped the pages to quickly to read them. While Mr. Burguieres did reside at Riverview for four or five months, he resided at the Chateau Living Center from 1988 until his death in 1995. Considering Mr. Burguieres was in the care of Chateau for a much longer period of time and, significantly, resided there when he executed his will, I find that *670 Ms. Villani's testimony is entitled to greater weight.
In addition, considering the comments to La. Civ.Code art. 1477, I find that the capacity to understand to whom an individual wishes to leave his property and the capacity to handle one's affairs require two different levels of mental competence. While an individual may be overwhelmed handling his financial affairs, this does not mean that he is incapable of deciding to whom he wishes to leave his belongings. Here, Mr. Burguieres needed someone to handle his affairs; however, it is clear from the record that he understood his medical condition enough to make his own medical decisions and understood his affairs enough to know to whom he wanted to leave his estate.
Based on the foregoing, I conclude that the appellant established by clear and convincing evidence that Mr. Burguieres had the capacity to execute his olographic will, dated November 7, 1991, and, thus, further conclude the trial court was manifestly erroneous in finding otherwise.

LAW AND ANALYSISISSUE THREE
The appellant also contends the trial court erred in finding that Mr. Burguieres' olographic will was the product of Dr. and Mrs. Pollingue's undue influence. I agree.
La. Civ.Code art. 1483 provides:
A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
In its reasons for judgment, the trial court relied on the testimony of Dr. De-Trinis and Dr. Bianchini. As stated above, however, I find that the testimony of the deceased's treating physician, Dr. Russell is entitled to greater weight. Dr. Russell's testimony shows that Mr. Burguieres had the capacity to execute his olographic will. After a thorough review of the record, I have found no evidence to support the conclusion that the will was the product of Dr. and Mrs. Pollingue's undue influence, much less clear and convincing evidence as required by La. Civ.Code art. 1483. The record shows that Mrs. Pollingue was dedicated to taking care of her brother and never treated him with anything but love and affection. She spent her life taking care of him and her other brothers' affairs. The record also shows that Dr. Pollingue often visited Mr. Burguieres; whereas, Mr. Burguieres' children did not visit or even attempt to visit him for a number of years. Accordingly, I find the trial court's conclusion that the deceased's will was the product of undue influence manifestly erroneous.
For the reasons assigned, I would reverse and vacate the trial court's judgment, dated June 28, 1999 and order that Mr. William Burguieres' olographic will, dated November 7, 1991, be executed as written and that Mrs. Pollingue be reinstated as executrix of his will.