714 So.2d 35 (1998)
Jody Tyson WILSON, Plaintiff-Appellant,
v.
Richard Kendrick WILSON, Defendant-Appellee.
No. 30445-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 1998.
*36 E. Ray Kethley, Shreveport, for Plaintiff-Appellant.
Claudius Whitmeyer, Shreveport, for Defendant-Appellee.
Before NORRIS, STEWART and CARAWAY, JJ.
NORRIS, Judge.
In this child custody case, the trial court rendered a judgment which maintained a prior award of joint custody designating the father, Richard K. Wilson, as the domiciliary parent,[1] but modified the physical aspects of the joint custody and the allocation of medical expenses. The mother, Jody T. Keel, *37 appeals arguing that the trial court erred in not designating her as the domiciliary parent, curtailing her physical custody and in modifying the allocation of medical expenses. For the following reasons, we affirm in part, amend in part, and render.

Facts/Procedural History
Richard and Jody were married in June 1990; Rachel, their only child, was born in June 1991. Less than one year later, Jody filed a petition for divorce requesting joint custody and domiciliary parent status. An interim order granted provisional custody to Jody. After a hearing on the rule held on October 26-29, and on November 2, 1992, the Honorable Gary A. Bowers, presiding, awarded joint custody but designated Richard as the domiciliary parent. The opinion indicated that Jody, then age 20, and Richard, then age 30, both cared for Rachel very much, but Jody suffered from a maturity problem in that she still enjoyed "cruising the strip," whereas Richard displayed that he was better able to provided for the child's daily needs. Therefore, the 1992 joint custody plan provided that Jody and Richard would have custody of Rachel 3 and 4 days a week respectively. The 1992 plan also made provisions for medical expenses incurred on Rachel's behalf; as refined by a January 1993 judgment on rule, the scheme was for Richard and Jody to pay, in proportions of 75% and 25% respectively, all medical expenses not covered by insurance. The parties subsequently obtained a divorce.
Thereafter, Richard initiated surveillance upon Jody. The surveillance principally documents Jody's alleged paramours, T.J. Young, David Hudec, and Kenneth Dale Keel Jr., visiting her trailer while Rachel was allegedly present therein; Jody's overnight visits to her male friends during the times she had physical custody of Rachel; and the conditions of Jody's household while the child was with her. In addition to the surveillance, Richard maintained a log of Rachel's physical condition when she was returned to him, the lack of readily able communication with Jody, and any other information Richard may have heard from others or from Rachel.
Based on this information, Richard, in November 1995, filed a petition seeking sole custody, a rule for contempt against Jody based on alleged violations of the 1992 joint custody plan, and an ex parte order allowing video inspection of the interior and exterior of the premises where Jody was allegedly living, i.e., Dale Keel's trailer.
On the morning of November 15, 1995, Richard conducted the video inspection of the suspected trailer and Jody was served with the above described petition. Later that day, Jody and Dale drove to Texarkana and got married. Less than a month later, Jody filed her own petition seeking domiciliary parent status and an increase in child support payments. Richard remarried as well in June of 1996 to Kim D. Wilson.
After lengthy delays, the matter again came before Judge Bowers in April 1997. After five days of trial, the judge, found that the "best interest" factors under La. C.C. art. 134 weighed more in favor of Richard and therefore continued joint custody with Richard as the domiciliary parent, but amended the joint custody plan to give Jody physical custody of Rachel from the end of school on the first, third, and fifth Friday of each month until Sunday at 5:00 p.m.; and to divide custody 50/50, in alternating seven-day periods during June and July; and to make special provisions during major holidays. The court also ordered each party to pay 50% of all medical, dental, and prescription expenses incurred on behalf of Rachel, including deductibles not covered by the insurance policy which the court ordered Richard to maintain. Jody takes the instant devolutive appeal assigning as error (1) the trial court's assignment of domiciliary parent status to Richard, and (2) the trial court's modification of the medical expense obligations where that issue was neither raised nor pled before the court.

Discussion: Burden of Proof
Although Richard seeks no relief on appeal, he raises the issue as to whether the trial judge applied the correct burden of *38 proof in assessing the physical custody allocation and domiciliary parent status.[2]
When a trial court has made a considered decree of permanent custody, the party seeking to modify the decree bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody, or of proving by clear and convincing evidence that any harm likely to be caused by a change of environment is substantially outweighed by the advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Gould v. Gould, 28,996 (La. App. 2d Cir. 1/24/97), 687 So.2d 685. The purpose of this heavy burden is to avoid extensive and repetitive litigation that could be harmful to the child and to avoid unnecessary changes in the child's life. Acklin v. Acklin, 29,193 (La.App. 2d Cir. 2/26/97), 690 So.2d 869; Christopher L. Blakesley, Child Support, 52 La. L.Rev. 607, 652 (1992).
A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. Evans v. Terrell, 27,615 (La.App. 2d Cir. 21/6/95), 665 So.2d 648, writ denied 96-0387 (La.5/3/96), 672 So.2d 695. If no considered decree has been rendered, the heavy burden imposed by Bergeron does not apply. Hargrove v. Hargrove, 29,590 (La.App. 2d Cir. 5/9/97), 694 So.2d 645, writ denied 97-1853 (La.10/31/97), 703 So.2d 24. Furthermore, a decree which is provisional, i.e., not permanent, has been held to be not subject to the heavy burden imposed by Bergeron. See, Pounders v. Rouse, 528 So.2d 672 (La.App. 2d Cir.1988) (terms of the judgment indicate that it is not a final determination of permanent custody); but cf. Plunkett v. Plunkett, 576 So.2d 100 (La.App. 2d Cir.1991) (finding that a considered decree lacking an express time limitation was not provisional).
Where the Bergeron burden of proof is inapplicable (due to no considered or permanent decree), the party seeking to modify the custody arrangement need only prove a change in circumstances since the original decree and prove that the new custody arrangement would be in the best interest of the child. But see La. C.C. arts. 132-33.
In 1992 the court reasoned that because Rachel was very young, less than 1½ years old, she needed prolonged contact with both parents. Therefore, the original joint custody plan gave Jody physical custody of Rachel 3 days a week, and Richard the remaining 4 days, with the transfers occurring on each Monday and Thursday morning. However, both the written opinion and the joint custody plan of 1992 incorporated into the judgment explicitly stated that this arrangement would be feasible only until Rachel's fifth birthday and would need to be modified before she started school. (R.pp.96,100,108).
At the beginning of the instant trial, Judge Bowers stated that the heavy burden imposed by Bergeron would not apply to the issues of joint custody or to domiciliary parent status. The court explained that Bergeron, which seeks to prevent unnecessary litigation, served no purpose in the instant case; instead, it was fully contemplated that a 4/3 custody would become unworkable once school commenced. Therefore, the court ruled that the "best interest" analysis along with a change of circumstances[3] would be the applicable burden of proof.
Under these facts, we find that the 1992 plan of physical custody, though considered, was provisional only, as contemplated by the parties as well as the court. Both the opinion *39 and the joint custody plan effectively limit the applicability of the 1992 scheme up to Rachel's fifth birthday. The plan, ab initio, was never intended to remain effective and unmodified subsequent to Rachel's commencing school without any reevaluation. Our finding that the 1992 decree was not permanent makes inapplicable both the reasoning and the burden of proof imposed by Bergeron. See, Pounders, supra.

Domiciliary Parent Status
Jody first assigns as error the trial court's designation of Richard as the domiciliary parent.
The paramount consideration in a change of custody contest is always the best interest of the child. La. C.C. art. 131; Stewart v. Stewart, 30,161 (La.App. 2d Cir. 1/21/98), 705 So.2d 802. In determining the child's best interest, there must be a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of the evidence presented. La. C.C. art. 134; Havener v. Havener, 29,785 (La. App. 2d Cir. 8/20/97), 700 So.2d 533. The factors in La. C.C. art. 134 are provided as a guide to the court in making the fundamental finding as to what disposition is in the best interest of the child. O'Brien v. O'Brien, 30,001 (La.App. 2d Cir. 12/10/97), 704 So.2d 933.
A trial court's determination of child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. Warlick v. Warlick, 27,-389 (La.App. 2d Cir. 9/29/95), 661 So.2d 706. An appellate court should be reluctant to interfere with custody plans ordered by the trial court in the exercise of its discretion. McKinley v. McKinley, 25,365 (La.App. 2d Cir. 1/19/94), 631 So.2d 45.
In the present case, the bulk of the evidence consisted of testimony to support or refute Richard's allegations that Rachel, while in Jody's custody, would spend the night under the same roof with Jody and one of her three alleged paramours.[4]
Jody testified that after she left the matrimonial domicile in the summer of 1992, she moved into her trailer where she stayed until moving in with her mother, Geraldine Tyson, in October 1994. Ms. Tyson testified that Jody lived with her until November 1995, whereupon Jody moved into her new matrimonial domicile with Dale Keel. Most noteworthy, Geraldine testified that during the time Jody was living with her, Jody and Rachel would always sleep there on the nights Jody had custody. (R.p.821).
According to Richard, Rachel said that she had slept in the same bed with Jody and T.J. Young, the first paramour. While Jody admitted that she engaged in sexual relations with T.J. Young, who lived with his mother, Tinker Young, and admitted to sleeping over at his residence with Rachel, she denied that she ever slept there while both Rachel and T.J. were present. However, Jody's own friend and witness, Tinker Young testified that Jody, Rachel, and T.J. all slept over at her trailer on the same night. When confronted with this contradiction, Jody stated that Ms. Young was wrong. (R.pp.695,846). We also note that Jody's testimony contradicts her mother's earlier testimony to the effect that whenever Jody had custody of Rachel, Jody would always stay home.
With respect to David Hudec,[5] who was unavailable to testify, Richard reported that Rachel said she "lived" at his home in Grambling. According to Richard, Rachel, then age 3, specifically recalled Hudec's kids and his dog, Cocoa. Jody testified that although she had spent the night at Hudec's, Rachel never had; Rachel had only taken naps there. (R.p.850). There was little other evidence on this point.
Finally, Richard alleged that Jody was living in Dale Keel's trailer during the summer and fall of 1995 (before their subsequent marriage), that Rachel would spend the night *40 at the trailer, and that on the following mornings, Jody, along with Rachel, would drive Dale to work in Jefferson, Texas. Beginning in July of 1995, Richard and Kim commenced surveillance upon Dale's trailer on days when Jody had custody of Rachel. Keeping a journal, Richard testified that he had seen Jody's vehicle at the trailer and had seen Jody leaving the trailer with Dale several times in the early morning hours. Both Kim and Richard testified that on one occasion, they saw Dale, Jody and Rachel leaving the trailer in the early morning hours;[6] on other occasions, Richard testified that the view was either obstructed or unclear.
Jody testified that she did spent the night in the trailer with Dale and that she took Dale to work on some occasions, but never when Rachel was present. She also testified that on some occasions, both herself and Rachel would arrive at Dale's trailer at 7:00 a.m. to pick up his laundry but that they were not at his trailer initially. Dale testified that while Jody slept over a few times, Rachel never did. He also testified that he sometimes used Jody's car to drive to work. In addition to a general state of uncleanliness, the unannounced video recording of Dale's trailer only showed Rachel's jacket, two pairs of her shoes, and her fishbowl.
Although the trial judge noted that Jody's decisions involving T.J. showed poor judgment, he found no evidence that they had an adverse effect upon Rachel. The trial judge also noted that the evidence was insufficient to prove that Jody and Rachel were living in Dale's trailer as permanent residents. At best, all that this evidence tends to prove is that Jody would sometimes forgo custodial time with Rachel in favor of her paramours.
Most of the other allegations made by Richard were not sufficiently proved. Richard alleged that Jody allowed Rachel to play unsupervised; she broke her leg while jumping on a trampoline at Christie Tyson's (Jody's sister-in-law) house. According to Richard, Rachel said she was not being watched. Christie testified that she was watching Rachel, as well as the other children playing in her backyard. Christie was able to recount the details about how Rachel fell. In addition, Christie testified that she contacted Jody, who then attempted to call Richard. (R.p.642). This testimony refutes the allegation that Jody failed to promptly notify Richard about the incident. The trial judge found that the trampoline accident was not the result of parental negligence.
Richard also alleged that the trailer where Jody and Rachel were supposedly living flushed raw sewage into the front yard[7] where Rachel was allowed to play. While the video tape (P# 34) depicts a 25' pipe attached to the trailer on one end and lying beside a small pool of waste on the other end, this was behind the trailer, not in front. In addition, Dale testified that the pipe was not used to convey a full discharge of sewage but only a small leak that occurred in the trailer's valve.
It was also alleged that Jody's twin cousins exposed their "private parts" to Rachel and that Jody failed to address the issue with the cousins' mother, Christie. Jody testified that although she did not believe the incident occurred, she eventually confronted Christie; Jody was present on the day the alleged event occurred and all she saw were the kids, Rachel and the cousins, covered under a blanket and talking. (R.p.859)
Richard also alleged that Jody failed to utilize a child's car safety seat for Rachel, despite the fact that Richard and Kim had provided one for Jody. Various witnesses confirmed this allegation.[8]
Richard's remaining allegationJody's failure to provide Rachel proper clothing and grooming, failure to maintain normal phone contact with Richard, and allowing Rachel to *41 ride on a motorcycle, 3-wheeler, and a horsewere simply not proven.
Jody countered with allegations of her own. She argued that Richard lives in a high crime area, on a busy street, and in a house with a front door leading directly into Rachel's room. However, the trial judge discounted the alleged high crime and high traffic associated with Richard's home in Vivian. Richard testified that Rachel's door leading outside is locked. His friend, Robert Ryan, testified that Rachel's door actually leads to an outside but closed porch. (R.p.419).
Jody argues in brief and at trial that Rachel demonstrated her parental preference at the Red Bud Festival. Dale's sister, Pamela K. Hemperly, testified that she and Jody were present on a Saturday at the festival when they saw Richard and Rachel. Richard allowed Rachel to visit with Jody alone for awhile. Pamela testified that while they continued to walk around the festival, she noticed that Rachel wanted to avoid her father. (R.p.670). However, on cross, Pamela discounted any implication that Rachel was not having a good time with her father; instead she said that Rachel just wanted to visit with her mother a little while longer.
On appeal, Jody primarily argues that willingness to facilitate and encourage a close and continuing relationship between the child and the Richard weighs more heavily in her favor. See, La. C.C. art. 134(10). As evidence, she points out the testimony of her friend Stacy Harrington, who said that Richard usually denied any request to exchange visitation periods. She additionally notes the "heinous and insupportable" allegations made by Richard. However, the trial judge opined that Richard has done an exemplary job in promoting a good relationship with Jody perhaps more than Jody has. (R.p.907).
Jody's second contention on appeal is that the responsibility for the care and rearing of the child previously exercised by each party weighs heavily in her favor. See, La. C.C. art. 134(12). At trial, her argument centered principally on the fact that Richard's parents, and not Richard, take care of Rachel. Jackie Wilson, Richard's mother, testified that on Thursdays and Fridays, she takes Rachel to and from school; and before Rachel started school, she would care for Rachel on those days. Kim testified that on Fridays after school, Jackie would bring Rachel over to Kim's office, where they would leave for Rachel's gymnastics class. Jody also brought out testimony that Richard was called away to work on some weekends; however, he testified that he is only "on call" one out of every eight weekends, or has only been called away on a weekend to work three times in the last two years. (R.p.587-8).
Jody, on the other hand, shows that she is not employed, and is available to take care of Rachel 24 hours a day. In support she cites our recent decision of Powell v. Powell, 28,911 (La.App. 2d Cir. 12/11/96), 684 So.2d 1084. In that case, we affirmed the trial court's decision to modify the original joint custody decree by reassigning domiciliary parent status to the mother where there was evidence that the father left his children alone during a thunderstorm to be with his girlfriend, consumed alcoholic beverages while operating a motor vehicle with his children present, and left the children in the care of his mother from 4:00 a.m. Monday until Thursday evening. Id. When the father was in town, he would not arrive at home until 6:30 p.m. each evening. Id. at 1087. The children informed the court that they wanted to live with their mother, that they did not like their father's girlfriends who stayed over, and one child said that he observed his father "do it" with a girl. Id. The mother had remarried and was employed in a position that allowed her to be at home when the children returned from school. Her new husband was willing to help his wife in caring for the children.
We find that case readily distinguishable. In Powell, there was evidence that the father was rarely around the children. Here, there was ample evidence that Richard was present and took care of Rachel on all days. At worst, when Rachel was not in school, Richard's mother would keep her until Richard returned that day, not four days later as in Powell. Now that Rachel is in school, Jackie Wilson mostly provides transportation from school to Kim's office. In any event, at the time of trial, Kim was pregnant and stated that she may terminate her employment to *42 be with both children. The trial judge was convinced that Kim would be a better step-parent than Dale. (R.p.905).
Although not noted in the trial court's reasons, we note that Richard and even Kim demonstrated a more in-depth knowledge about Rachel's education than Jody. It also appears from the record that Richard's inability to be continually present with Rachel for all hours of the day is involuntary; Jody's past behavior of leaving Rachel with her mother during her time of custody while she went to visit her paramours was voluntary.
After all evidence on this matter was taken, the trial judge found that factors under Article 134 weighed more heavily in Richard's favor. On this record we cannot say that the trial judge abused his great discretion in maintaining Richard Wilson as the domiciliary parent.

Physical Custody Allocation
On appeal, Jody argues that the trial court erred in curtailing her physical custody.
Prior to trial, the court advised the parties that the 1992 joint custody plan splitting custody in the middle of the week might be unworkable. (R.p.276). Towards the end of trial, the court asked both Jody and Richard whether it would be in Rachel's best interest to be in one home during the school week as opposed to having the time split. Both said that it would be easier on Rachel to be in one home during the school week. (R.p.868,871). Richard additionally stated that Rachel must carry many items to and from school, including duplicate school supplies to facilitate the transfer, and that some school children have noticed that Rachel is "different" because of this.
At the end of closing arguments, the court informed the parties that there would be joint custody and equal sharing with Richard as the domiciliary parent; the court was unwilling to order a conventional joint custody arrangement where Jody would have her time reduced from three days a week to four days a month. (R.p.906,909). After making these oral remarks, the parties expressed a desire to work out the physical custody and the trial judge allowed the parties 10 days[9] to fashion their own custody plan. Apparently their efforts to reach a compromise were unsuccessful, and one month after the trial judge's recitation of oral reasons, the court, without further comment, filed its own amended joint custody plan.
However, the amended plan did not reflect the trial court's earlier oral comments. It provides Richard with physical custody of Rachel except on the first, third, and fifth Fridays, from the end of school until 5:00 p.m. Sunday; during the months of June and July, Jody and Richard each have custody for seven consecutive days with transfer occurring each Friday at 5:00 p.m.; and special provisions for holidays and emergencies. The court offered no explanation for its apparent change of position.[10]
Nonetheless, an appeal lies from the judgment itself, not the reasons for judgment. Welborne v. Welborne, 29,479 (La. App. 2d Cir. 5/7/97), 694 So.2d 578, writs denied 97-1800 (La.10/13/97), 703 So.2d 621 and 97-1850 (La.10/13/97), 703 So.2d 623; La. C.C.P. art.2083. When the record reveals a reasonable factual basis for the findings of the trier of fact, and those finding are not manifestly erroneous, an appellate court should affirm the judgment made in the lower court. Welborne, supra.
An implementation order of joint custody shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents. La. R.S. 9:335 A(2)(a). To the extent it is feasible and in the best interest of the child, physical custody should *43 be shared equally. La. R.S. 9:335 A(2)(b). However, joint custody does not require equal sharing. Williams v. Williams, 540 So.2d 1013 (La.App. 2d Cir.1989). Substantial time, rather than strict equality of time, is required under a joint custody scheme. Pahal v. Pahal, 606 So.2d 1359 (La.App. 2d Cir.1992).
Additionally, we are mindful of our own recent jurisprudence which has reversed or amended joint custody awards where the non-domiciliary parent is granted less than 100 days of custody. See, O'Brien, supra, and citations therein. However, we do not lay down hard and fast rules and guidelines in these cases. Carroway v. Carroway, 475 So.2d 48 (La.App. 2d Cir.1985). Every child custody case must be viewed on its own peculiar set of facts and relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. O'Brien, supra.
In this case, we have two capable parents who both testified that it would be in Rachel's best interest to be in a single home during the school week. However, the court additionally found that it would not serve Rachel's best interest by drastically deviating from the present physically custody arrangement. Using 1998 as an exemplar year, we find that under the amended physical custody arrangement, Jody would have custody for approximately 76 days.
Because the court determined that Jody was a capable and loving parent, that Rachel would be harmed by any modification that would substantially deprive her time with either parent, and because the court failed to articulate reasons for rendering a judgment that grossly deviated from its oral comments, we find that the trial court abused its discretion by imposing a physical custody arrangement which denies Jody substantial time. Pahal v. Pahal, 606 So.2d 1359 (La. App. 2d Cir.1992). On the special circumstances presented, Rachel requires a plan that will maintain her in one home during the school week while assuring frequent and continuing contact with Jody.
We therefore will modify Section A(1) of the amended plan to give Jody physical custody of Rachel from Friday afternoon to Sunday evening on the first, second, fourth, and fifth weekends of each month during August through and including May, subject to the summer vacation and other special provisions made therein. Judgment will be rendered accordingly.
This modification provides Jody with an extra weekend per applicable months and assures frequent and continuing contact with Rachel while maintaining Rachel in one home during the school week; it serves the best interest of the child and is more consistent with the trial court's oral comments.

Medical Expenses
Jody also assigns as error the trial judge's reallocation of her share of medical expenses where that issue was neither pled nor placed before the court.
The original custody plan as finalized by the 1993 judgment on rule provided that Richard and Jody, in proportions of 75% and 25% respectively, would be responsible for all medical expenses not covered by insurance incurred on behalf of Rachel. The amended plan adjusted the obligations by (1) making each party equally responsible (50/50) for medical, dental, and prescription expenses including deductibles not covered by insurance, and (2) ordering Richard to maintain major medical and hospitalization insurance policy on Rachel. Richard does not appeal that part of the order ordering him to maintain the insurance.
Except as provided in Article 1703, a final judgment shall grant relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contains no prayer for general and equitable relief. La. C.C.P. art. 862. Nevertheless, article 862 does not confer jurisdiction on a trial court to decide issues which the litigants have not raised. Gibson v. Gibson, 592 So.2d 855 (La.App. 3d Cir.1991); Danforth v. Claiborne Parish Police Jury, 571 So.2d 707 (La.App. 2d Cir.1990). The court may only grant relief warranted by the arguments contained in the pleadings and the evidence. Marino v. Marino, 576 So.2d 1196 (La.App. 5th Cir.1991).
*44 The record reflects that the issue of medical expenses was neither presented nor pled to the court.[11] And although the trial judge is vested with great latitude, we have neither evidence upon which to review whether that discretion was breached nor have we been provided any grounds upon which the decision to modify the expense allocation was based. We therefore conclude that the trial judge abused its discretion in altering the ratio of shared medical expenses contained in the amended joint custody plan where neither the issue nor any evidence was placed before the court. We will amend the judgment accordingly.

Conclusion
We affirm the judgment insofar as it awards domiciliary parent status to Richard. We amend the physical custody arrangement to provide the following:
A. PHYSICAL CUSTODY
* * * * * *
(1) MONTHS OF AUGUST THROUGH/ INCLUDING MAY: On the first, second, fourth, and fifth Friday commencing from the end of school until 5:00 p.m. on Sunday, Rachel shall reside with JODY TYSON WILSON KEEL.
This modification is effective immediately upon rendition of this opinion. We amend the trial court's judgment to reinstate the former ratio of shared medical expenses of 75% and 25% to Richard and Jody respectively. Costs of appeal are assessed equally to both Jody T. Keel, appellant and Richard Wilson, appellee.
AFFIRMED IN PART, AMENDED IN PART AND RENDERED.
NOTES
[1] The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents. La. R.S. 9:335 B(2). The domiciliary parent shall have the authority to make all decisions affecting the child unless an implementation order provides otherwise. La. R.S. 9:335 B(3). All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. Id.
[2] Because the trial judge modified physical custody, we are squarely presented with the issue as to whether the trial court applied the correct burden of proof insofar as the modification of physical custody is concerned. Nevertheless, our finding that Jody has failed to achieve domiciliary parent status even under the lesser best interest determination obviates the need for us to address the burden of proof issue insofar as it impacts upon domiciliary parent status. See Glover v. Tooley, 25,988 (La.App. 2d Cir. 8/17/94), 641 So.2d 1032.
[3] The judge noted that a clear and convincing burden of proof is required to establish sole custody, however, Richard's counsel noted that Richard's previously retained attorney drew the November 1995 petition and that Richard was not fixated on sole custody. Instead, Richard just seeks to modify the plan to where he could monitor the child's school time. (R.p.266). During mid-trial, Richard stated that all he wants is domiciliary parent status; sole custody is not an issue. (R.pp.633-36).
[4] Most of the evidence to support these allegations consisted of Rachel's statements to Richard and Kim.
[5] On cross, Jody testified that her relationship to David Hudec was limited to friendship, although on direct examination, she admitted to dating him. Stacy Harrington, Jody's friend, additionally testified that Jody was dating David. In any event, Jody denies engaging in sexual relations with him.
[6] However, this one time sighting of Rachel with Jody and Dale was not written in their logs.
[7] Richard did acknowledge that the allegation concerning the raw sewerage was incorrect insofar as there was no discharge in the "front" yard but rather behind the trailer, and also concerning the allegation that Rachel was being allowed to play in and around the sewerage; he said he asked his former attorney to amend the petition, but it never was done. (R.p.620).
[8] Such witnesses include Amy Young (R.p.296); Steve Wilson, Richard's father (R.p.337); Jackie Wilson (R.p.347); and Richard himself (R.p.555).
[9] On April 15, the District Court stated that unless the parties were able to develop a physical custody plan and present it in 10 days, one would be drawn up by the court. However, the correspondence letters contained in Volume I of the record indicates that the parties were allowed additional time.
[10] It is somewhat perplexing why the trial judge, one month following his lengthy recital of reasons, issued a plan which contradicted that reasoning.
[11] We fail to find anywhere in the record where Richard or his attorney asked the court for a modification of child support. Only one reference in the record seems to indicate otherwise, but it is not all that clear whether the trial court is directing its comments towards Richard or Jody. (R.p.913). While it is correct that Jody did ask for a child support modification in her petition, the trial judge did state that those issues would only be presented if in fact Jody prevailed upon her rule. (R.p.258-59). The only evidence in the record which would appear to even impact upon the child support or medical expense issue is an income and expenses affidavit at p. 206 in the record. And we cannot tell who even signed the sheet as there is no apparent signature.