768 So.2d 614 (2000)
Shawnna M. SCHUCHMANN (Loftin)
v.
John SCHUCHMANN.
No. 00-094.
Court of Appeal of Louisiana, Third Circuit.
June 1, 2000.
*615 Martha Ann O'Neal, O'Neal & Leavoy, DeRidder, Louisiana, Counsel for Defendant/Appellant: John Schuchmann.
John K. Anderson, Anderson & Westerchil, Leesville, Louisiana, Counsel for Plaintiff/Appellee: Shawnna Schuchmann (Loftin).
(Court composed of NED E. DOUCET, Jr., Chief Judge, SYLVIA R. COOKS, and JOHN D. SAUNDERS, Judges).
DOUCET, Chief Judge.
Defendant, John Schuchmann, appeals a judgment of the trial court changing domiciliary custody of his minor son, Anthony M. Schuchmann, from himself to his ex-wife, Shawnna Schuchmann Loftin. We reverse the judgement of the trial court.

FACTS
John and Shawnna were married in the state of Washington July 17, 1993. At the time, John, who is in the military, was stationed at Ft. Lewis, Washington. A son, Anthony Michael, was born to the couple on January 17, 1994. Apparently, the marriage was a rocky one and the couple separated in September 1995. Shortly thereafter, in November 1995, John was transferred to Ft. Clayton, Republic of Panama. Shawnna and Anthony remained in Washington. About this same time, Shawnna renewed her acquaintance with Glen Loftin, a member of the U.S. Air Force, whom she describes as her high school sweetheart. In February 1996, Shawnna took Anthony and moved with Glen to Rosepine, Louisiana, where they set up house-keeping.
Sometime early in 1997, John learned that Shawnna was pregnant with Glen's child and finally agreed to a divorce. The parties agreed that John was the one who contacted and paid an attorney in Leesville. The attorney filed a petition for divorce, under the provision of La.Civ. Code art. 103(1), on Shawnna's behalf on February 25, 1997. Filed along with the petition for divorce was an acceptance of service of process which John had previously executed in Panama. In the divorce decree, which was granted March 7, 1997, John and Shawnna were granted joint custody of Anthony with John being designated "the primary custodial parent." Even though John was named primary custodial parent, Anthony continued to reside with Shawnna until John could make arrangements *616 for suitable housing, a nanny, and could get leave to return to the U.S. from Panama. The latter was in June of 1997. From June of 1997 through the judgment of the trial court rendered July 19, 1999, John was, in fact and in deed, the primary custodial parent of Anthony. Shawnna did have several periods of visitation during this two year period.

LAW AND DISCUSSION
Recently, in Roberie v. Roberie, 33,168 (La.App. 2 Cir. 12/8/99); 749 So.2d 849, our brethren of the second circuit recounted the law applicable to the case before this court stating:
The best interest of the child is the sole criterion to be met in awarding or modifying custody under La. C.C. art. 131. See also Bordelon v. Bordelon, 390 So.2d 1325 (La.1980). When a trial court has made a considered decree of permanent custody, the party seeking to modify the decree bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody, or of proving by clear and convincing evidence that any harm likely to be caused by a change of environment is substantially outweighed by the advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Wilson v. Wilson, 30,445 (La.App.2d Cir.4/9/98), 714 So.2d 35.
A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. Evans v. Terrell, 27,615 (La.App.[2d Cir.]2/6/95), 665 So.2d 648, writ denied, 96-0387 (La.5/3/96), 672 So.2d 695. By contrast, a judgment with a custody plan that was entered by default, was not contested or was merely entered by consent of the parties is not a considered decree. Barnes v. Cason, 25,808 (La. App.2d Cir.5/4/94), 637 So.2d 607, writ denied, 94-1325 (La.9/2/94), 643 So.2d 149.
. . . .
Where the Bergeron burden is inapplicable, the party seeking to modify the custody arrangement need only prove a change in circumstances since the original decree and prove that the new custody arrangement would be in the best interest of the child. Wilson, supra; Barnes, supra.

La. C.C. art. 134 outlines the factors in determining the best interest of a child:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

*617 (11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
Further, in determining what the best interest of the child is in a change of custody case, courts must examine all relevant factors including stability of environment, standard of living each parent can provide and the prior history of the child's custody. Parker v. Parker, 424 So.2d 1070 (La.App. 4th Cir.1982). Continuity and stability of environment are important to consider in child custody matters. Ezell v. Kelley, 535 So.2d 969 (La.App. 2d Cir.1988). A change from a stable environment should not be made absent a compelling reason. Day v. Day, 97-1994 (La.App. 1st Cir.4/8/98), 711 So.2d 793.
Id. at pp. 3-6; 852-53.
In Gautreau v. Gautreau, 96-1548, p. 6 (La.App. 3 Cir. 6/18/97); 697 So.2d 1339, 1345, writ denied, 97-1939 (La.11/7/97); 703 So.2d 1272, we noted the following:
"The wording of Article 134 illustrates that the court is not bound to make a mechanical evaluation of all factors listed." Breaux v. Breaux, 96-214, p. 4 (La.App. 3 Cir. 7/17/96); 677 So.2d 1106, 1108. Rather, "[e]ach case should be decided on its on [sic] facts in light of these factors." Id. Absent a clear showing of an abuse of discretion, an award of custody by a trial court will not be disturbed. Mayeux v. Mayeux, 93-1603 (La.App. 3 Cir. 6/1/94); 640 So.2d 686.
Additionally, we consider the following:
Custody should not be changed when to do so would punish a parent for past behavior when there is no proof of a detrimental effect on the children. Interference with visitation alone is not a sufficient reason to change custody absent a showing of a detrimental effect on the children. Everett v. Everett, 433 So.2d 705 (La.1983); Head v. Head, 500 So.2d 804 (La.App. 1st Cir.1986). An award of custody is not a tool to regulate human behavior. Everett, 433 So.2d at 708.
Smith v. Smith, 615 So.2d 926, 934 (La. App. 1 Cir.), writ denied, 617 So.2d 916 (La.1993).
In explaining his ruling the trial judge stated that he found that there was a change in circumstances "during the period of April of 98[sic] through May of 1999," in that Shawnna did not get to visit with Anthony during that time. He noted that John had returned to the U.S. to get married in October of 1998, and found it unreasonable "that he could not have arranged for a period of visitation with the mother during that period of time." The trial judge also stated "the Court finds that for most of the child's life the mother was the primary caretaker of the child" and that "a 5 year old child usually wants his mama when he getsstumps his toe or cuts his finger." He then concluded that it would be in the best interest of the child, "from an emotional standpoint" to vest primary custody in the mother.
We find the record does not support the conclusion reached by the trial judge that Shawnna was the primary care giver for the most of Anthony's life. Anthony was born on January 17, 1994. At that time John and Shawnna were living together as husband and wife. The record does not reveal the division of child caring responsibilities at that time. The couple separated in September of 1995, with Anthony remaining in Shawnna's care. She was the primary care giver from September 1995 until June 1997, a period of twenty-one months. During that period of time John was able to return to the U.S. for visitation with Anthony in January 1997. In June 1997 John took Anthony to live with him in Panama. Anthony was with John for the next six months, until John returned to the U.S. from Panama for leave during the Christmas holidays in December 1997. John arranged for Shawnna to have visitation with Anthony from January 1, 1998, through Easter, in March of that year. *618 However, Shawnna took Anthony from Louisiana to Washington and refused to return him as planned. In order to regain physical custody of Anthony John had to engage legal counsel in Washington and have a writ of habeas corpus issued. Anthony was return to John in April of 1998 and remained in his care until the first court hearing in the case on March 9, 1999. Anthony was returned to John's custody from May 15 through July 5, 1999. Thus, from June of 1997 through July 1999, John was Anthony's primary care giver for nineteen months. Hence, from the date that John and Shawnna separated through July 1999, Shawnna was primary care giver for only two more months than John.
As to John's failure to arrange visitation between Shawnna and Anthony in October 1998, we find this very understandable. Just six months before John had been forced to retain counsel and resort to a writ of habeas corpus to force Shawnna to return Anthony after a visit. Additionally, John was in the country to get married, an event which would not encourage contact with an ex-spouse.
We find that John's failure to arrange visitation in October 1998 was no more a change in circumstances than Shawnna's failure to return Anthony the previous March.
As to the "emotional" well being of Anthony, the record is devoid of any testimony or evidence of Anthony's emotional state. From the testimony it appears that Anthony has adjusted to both households. If the witnesses are to be believed, he loves and gets along with his half brothers in Shawnna's home and has taken to calling his step-mother "mother" while in his father's home. No one who testified even hinted that either parent or step-parent was unfit, unloving or unsupportive.
Inasmuch as John's role as primary custodial parent was via a consent decree, Shawnna's burden of proof, as the party moving for modification, was to show a material change in circumstances affecting the welfare of Anthony since the original decree and that the proposed change was in the best interest of the child. Page v. Page, 96-69 (La.App. 3 Cir. 5/8/96); 673 So.2d 1317, citing Hensgens v. Hensgens, 94-1200 (La.App. 3 Cir. 3/15/95); 653 So.2d 48, writ denied, 95-1488 (La.9/22/95); 660 So.2d 478.
As far as we can see, the only material changes affecting Anthony were Shawnna's and John's marriages, the closing of Ft. Clayton in Panama and John's transfer to Ft. Bragg in North Carolina. We view these as a plus for Anthony, as he will have both a mother and father figure in both households, be closer to all of his relatives and visitation will be easier to arrange and accomplish. None of the changes in John's life adversely affected Anthony.
At the time of the trial of this matter, the choice of domicile for Anthony was with a mother with a ninth grade education who lives in a trailer in the country with a husband who drives a truck, is out of town several nights a week and who received a "less than honorable" discharge from the Air Force; or in a traditional house, several hundreds yards from the school he would attend, with a service member father and an ex-service member mother who are better educated and place much emphasis on education. Testimony established that each would be a loving and caring home.
It is clear that Shawnna failed to carry her burden of proof. She produced no evidence that any of the changes in her's or John's situation affected the welfare of Anthony. Further, we find no evidence to support the trial judge's conclusion that changing Anthony's primary custodial parent would be in his best interest.
Accordingly, we reverse the judgment of the trial court making Shawnna Schuchmann Loftin primary custodial parent of Anthony M. Schuchmann and reinstate John Schuchmann as primary custodial parent. It is further ordered, adjudged and decreed that visitation will be as follows: *619 Since the distance between the parties is some 500 miles and this minor child will be subjected to extensive travel, this court orders that visitation with the mother should take place every second weekend of the month unless the parties mutually agree to another time and as excepted below. Visitation will commence from Friday evening at 6:00 P.M. until Sunday evening at 6:00 P.M., unless the parties mutually agree to another time. Anthony will be exchanged as close as possible to half way between the two residences. The parents will alternate Anthony's birthday, if his birthday falls on a week-end, the regular monthly visitation will take place with the mother on even years, in other years the regular visitation will take place the weekend before his birthday. Easter should be alternated with visitation beginning not later than 6:00 p.m. on Holy Thursday and ending Easter Sunday at 6:00 p.m. This visit will be in lieu of the regular visit for the month in which Easter falls. May visitation with the mother should be over Mother's day week-end. Anthony shall spend at least every other Father's Day with his father. The parents will alternate Thanksgivings with visitation beginning not later than 6:00 p.m. the day before Thanksgiving through 6:00 p.m. the Sunday afterward. The Christmas-New Year holiday period will also be alternated with Christmas visitation beginning at 6:00 p.m. on December 23rd and ending at 6:00 p.m. December 27th. New Year visitation will begin at 6:00 p.m. December 27th and end at 6:00 p.m. January 2nd, unless that day is a school day, in which event visitation will end on January 1st. We encourage the parents to take into consideration school holidays and to the extent feasible, make the monthly visits coincide with those holidays and to extend the visits accordingly. Shawnna should have six weeks visitation in the summer, with visitation to end no later than one week before school starts.
The parents are encouraged to communicate at least one time per week. Communications should include all factors affecting the welfare of the child. All information regarding school, report cards, conferences, trips, functions, meetings, etc. should be furnished to the other parent as either parent receives same. Each parent should maintain sufficient flexibility to allow for variations made necessary by the ebb and flow of social, educational, and recreational life. Each parent shall transfer to the other sufficient wardrobe for the child, considering the season. The child shall have reasonable access to communication with each parent. No communication shall be intercepted, censored, or monitored.
Each party will bear his/her own cost for this appeal.
REVERSED AND RENDERED.