NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-0452

AMY GOLDBERG

VERSUS

JARROD GOLDBERG

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 60,961
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Billy H. Ezell, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

Robert I. Thompson, III
900 Pierremont Road, Suite 102
Shreveport, LA 71106
(318) 865-2345
COUNSEL FOR PLAINTIFF/APPELLANT:
    Amy Goldberg

William D. Dyess
870 West Main
Many, LA 71449
(318) 256-5667
COUNSEL FOR DEFENDANT/APPELLEE:
    Jarrod Goldberg

PETERS, J.

This litigation arises from a dispute over the custody of two minor children born of the marriage of Amy Goldberg (Amy) and Jarrod Goldberg (Jarrod). The matter is now before this court because Amy has appealed the trial court's designation of Jarrod as the domiciliary parent in a joint custody judgment. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

Amy and Jarrod were married on August 1, 2003, in Baytown, Texas, and two children were born of this marriage: Ethan Goldberg, born July 15, 2004, and Ayden Parker Hall Goldberg, born August 10, 2006. The marriage relationship underwent various separations and reconciliations, and the parties were ultimately divorced in Ohio on September 7, 2007. The divorce decree named Amy as the "sole residential parent and legal custodian" of the minor children, provided Jarrod with parenting time that increased in three phases, and awarded Amy $828.13 per month in child support.

At some unspecified point during or immediately after the divorce proceedings Amy and the two children returned to Texas, and ultimately settled in her mother's home in Many, Sabine Parish, Louisiana. Jarrod also returned to Texas during the same time period. After the divorce, both parties remarried: Jarrod married Jeanna Elizabeth Goldberg (Jeanna)[1] and Amy married Larry Metcalf (Larry).

On June 17, 2008, Amy filed a petition under La.R.S. 13:1827,[2] seeking to have the Ohio custody decree recognized and enforced in Louisiana. She attached an affidavit to her petition asserting that Jarrod "took these children and has secreted

_____

[1]Jeanna is sometimes referred to in the record as "Gina."

[2]Louisiana Revised Statutes 13:1827 establishes the method by which a child custody determination issued by the court of another state may be registered in Louisiana.

them since May 28, 2008 at an address and/or location unknown to [her], but believed to be in the State of Texas in the Beaumont, Texas area." Ultimately, on August 6, 2008, the trial court registered the Ohio judgment pursuant to La.R.S. 13:1827.[3]

On August 11, 2008, Amy filed a petition for a civil warrant, seeking to have the children returned to her physical custody. Jarrod responded on August 28, 2008, by filing his own petition seeking sole custody of the two children. The custody issue ultimately went to trial on the merits on December 9, 2009.[4] At that trial, the primary evidence directed at the custody issue was provided by the testimony of Jarrod and Amy,[5] and through evaluation reports prepared by Dr. John C. Simoneaux, a Pineville, Louisiana psychologist.

Upon completion of the evidentiary stage of the trial, the trial court took the custody issue under advisement and, on January 7, 2010, rendered judgment awarding the parents joint custody of the minors, designating Jarrod as the domiciliary parent, and establishing the particulars of the joint custody plan. After the trial court denied Amy's motion to reconsider the judgment, she perfected this appeal, with two assignments of error:

I.  The trial court erred in not determining the proper burden of proof that defendant-appellee had to meet, as the result of a prior Ohio judgment, to change custody.

II. The trial court erred in not accepting the conclusions of Dr. Simoneaux, especially in light of the paucity of other evidence presented, when the court changed custody removing two

---

[3]Initially, the trial court stayed the Louisiana proceeding pursuant to La.R.S. 13:1829 because Jarrod had filed a similar suit in Hardin County, Texas.

[4]The record contains numerous stipulations, agreements, and trial court orders relative to interim issues of continued custody, support, visitation, and psychological testing, most of which are not pertinent to the issues addressed at trial on the merits.

[5]Amy's mother and step-father also testified, as did Jarrod's current wife.

2

brothers, 5 and 4-year-old [sic], from the only caregiver they had had and from the stable environment they had been raised in.

## OPINION

Each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interests of the children. *Barberousse v. Barberousse*, 556 So.2d 930 (La.App. 3 Cir. 1990). On appeal, a trial court's ruling on a change of custody request may only be disturbed if the reviewing court determines that the trial court abused its discretion in making its ruling. *Franklin v. Franklin*, 99-1738 (La.App. 3 Cir. 5/24/00), 763 So.2d 759. In addition, a reviewing court may set aside the trial court's findings of fact only upon determining that the trial court was manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The issue is whether the trial court's conclusion was reasonable in light of the entire record. *Mart v. Hill*, 505 So.2d 1120 (La.1987).

In seeking a review of the trial court's judgment, Amy first suggests that, because the trial court committed legal error in not providing written reasons for its judgment, this court should perform a *de novo* review of the record as a whole. In rejecting this argument, we note that Amy did not avail herself of La.Code Civ.P. art. 1917, which requires a trial court to provide written reasons for judgment "when requested to do so by a party." Thus, there is no merit in her argument that the trial court's failure to provide written reasons for judgment is a legal error. *Meyers v. Fairfield Inn*, 01-801 (La.App. 3 Cir. 12/12/01), 801 So.2d 632*, writ denied*, 02-119 (La. 3/22/02), 811 So.2d 933. We will review the factual findings pursuant to the manifest error standard of review. *Rosell*, 549 So.2d 840.

3

### *Assignment of Error Number One*

In her first assignment of error, Amy argues that the Ohio judgment should be analyzed as a considered decree, and that the trial court erred in not designating it as such. According to Amy, this determination of whether the Ohio decree is a considered decree or a consent decree is essential to determine the burden of proof to be applied to Jarrod's request to change custody.

While we agree that the determination of the Ohio judgment is necessary to establish Jarrod's burden of proof, we do not agree with Amy that the Ohio judgment is a considered decree as contemplated by the holding in *Bergeron*, and we do not agree with Amy's suggestion that this court remand the matter to the trial court to determine the nature of the decree. The content of the Ohio judgment makes it clear that it was rendered as a consent decree. In fact, the judgment itself is titled as an "AGREED JUDGMENT ENTRY - DECREE OF DIVORCE." Furthermore, the preamble paragraph of the judgment recites that both parties were present in court with their attorneys and that "[t]he parties being desirous of resolving the pending matters before the Court, *entered into an agreement*, which was read into the record and acknowledged by both parties before the court." (Emphasis added.) The initial paragraph concludes that "[t]he Court hereby adopts, approves and incorporates herein, *said agreement* and makes it an Order of the Court." (Emphasis added.)

When the prior custody judgment is a consent decree, the party seeking a change is only required to establish that a material change of circumstances has occurred since the original decree and that the proposed custody arrangement is in the best interest of the minor child. *Schuchmann v. Schuchmann*, 00-94 (La.App. 3 Cir. 6/1/00), 768 So.2d 614. However, when there is a prior considered decree

4

establishing custody, the party seeking the change must prove that "the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La.1986).

Because the Ohio judgment is a consent judgment, Jarrod was not bound by the stringent burden of proof required by the *Bergeron* decision. Instead, Jarrod needed only establish a material change of circumstances since the original decree, and that the proposed change of custody is in the best interests of the minor children. *Schuchmann*, 768 So.2d 614. We find no merit in Amy's first assignment of error.

### *Assignment of Error Number Two*

In this assignment of error, Amy addresses the sufficiency of the evidence presented. While she does not argue the sufficiency of the evidence with regard to the "material change of circumstances" element, she asserts that the evidence does not justify a finding that Jarrod satisfied the "best interests" element by the clear and convincing evidence standard of La.Civ.Code art. 132.

The testimony presented at trial is rather sparse. It does establish that, at the time of trial, Jarrod resided in Dayton, Texas, with his current wife, Jeanna, and her thirteen-year-old son. Part of the reason for his custody change request was his serious concern about how Amy was caring for the two children. Jarrod testified that when the two boys were with him in the summer of 2008, neither child was potty-trained[6] and Ethan had severe dental problems. Jarrod also expressed concern with Amy's marriage to Larry Metcalf, a convicted felon who was serving time in the state

---

[6]At that time, Ethan was four years of age, and Ayden was two.

5

penitentiary when Amy married him. He and his current wife testified that they had a stable relationship, both were in favor of the attempt to gain custody, and that the children got along well with Jeanna's son.

Amy testified that at the time of the trial on the merits, she was living with her mother and stepfather. However, despite the testimony of both her and her mother and step-father that all three had a close and supportive relationship with Ethan and Ayden, Amy testified that she had remained in their home only because the trial court had ordered her to do so and that she was planning to get an apartment of her own and a job in the immediate future.[7]

With regard to her relationship with Larry Metcalf, Amy testified that she married him while he was in prison because he needed support from "someone that could write to him and send him packages." She acknowledged that Larry was currently incarcerated for theft. However, although she knew he had a prior criminal history, she was not aware of the particulars of that activity. Amy testified that she had divorced Larry, but had only done so at the insistence of the judge and her lawyer because they convinced her it was in the children's best interests.[8] She was unsure of the date of the divorce, but believed it was in May of 2009. When questioned concerning the effect of her relationship with Larry on the children, Amy stated that her marriage to Larry had nothing to do with her own life, much less the lives of the children.

---

[7]By an order rendered on October 6, 2008, and pursuant to stipulations of the parties, the trial court had ordered that the litigants remain at their current residences.

[8]Earlier pleadings in these proceedings make it clear that Amy's relationship with Larry was a significant issue. A May 12, 2009 interim agreement accepted by the trial court provided that Amy agreed to have no contact with Larry although, at the time, she was still married to him. Additionally, an October 23, 2009 interim stipulated judgment included the provision that Amy "shall finalize her divorce from and have no contact with Larry W. Metcalf."

By agreement of the parties, and pursuant to an October 6, 2008 trial court order, Dr. Simoneaux interviewed Amy, Jarrod, and Jeanna.[9] The reports prepared as a result of these interviews contain significantly more factual background than does the evidentiary record.

Jarrod's interviews took place on January 8, 2009 and February 27, 2009, Amy's on January 20, 2009; and Jeanna's on May 6, 2009. Dr. Simoneaux described his evaluation of Jarrod as an "interim evaluation" because he had yet to see the other parties. He described Jarrod as cooperative and patient during the process, and he elicited a significant background from Jarrod that extended from the time he and Amy began dating through the problems arising from this litigation. Without repeating that history, it is sufficient to say that the couple had a most complicated relationship which had numerous up and down periods. Jarrod's quest for custody began when he was able to locate Amy and the children after she left Ohio. He told Dr. Simoneaux that when he observed the condition of the children, he realized he must do something.

In the interview, Jarrod acknowledged his shortcomings as well as his problems with Amy, and even identified a large number of positive traits possessed by Amy. Still, he asserted that he was in a much better position to provide a structured environment for his children. After completing the interview and administering a number of psychological tests, Dr. Simoneaux concluded as an "interim" finding that:

> Jarrod makes very provocative statements about Amy. He describes her as being very unstable, with particular concern being expressed about her drug abuse. Of course, if Jarrod's concerns prove to be valid, this would severely affect her ability to serve as an adequate parent to these children. I am impressed that Jarrod has pursued this matter for some

[9]The order also required that Dr. Simoneaux interview the two children, but this never occurred.

7

time, and apparently at great expense, because he is genuinely concerned about the welfare of these children. He argues that he and his wife provide a stable environment, he has a good job, and he is emotionally much more stable than then[sic] mother. He seems to have been relentless in his efforts to be a part of his children's lives. He spoke very affectionately and emotionally about his concerns for these children.

According to Dr. Simoneaux, Amy appeared "rather nervous" during her interview, "but was cooperative with the evaluation process." She also provided Dr. Simoneaux with an extensive factual background, beginning from the dating process through this litigation. Comparing the two factual backgrounds presented, it is clear that the couple have very different concepts of how to live their lives. Although she initially found Jarrod to be "[t]he best man in the world," after marriage, Amy concluded he was without emotion and spent far too much time reading. Their different approaches to life resulted in separations and, ultimately, to Amy's involvement in an extramarital affair. Despite reconciliation after this affair, the marriage did not last. When Amy left Ohio with the children, she moved into her grandmother's home, but with the man with whom she was involved in the extramarital affair. In December of 2006, she moved to Sabine Parish and her mother's home.

With regard to Larry, Amy told Dr. Simoneaux that he is currently incarcerated and, at the time of the interview, had one year left on his sentence. While having no information concerning Larry's prior criminal history, Amy still asserted to Dr. Simoneaux that Larry "loves those kids." She acknowledged three live-in relationships, and despite stating that she was in the process of obtaining a divorce from her incarcerated husband, that relationship was "still ongoing." Dr. Simoneaux noted in his report that Amy stated that Larry "is 'temporarily incarcerated,' but said

8

that he writes letters every day to the boys telling how much he loves and cares for them."

In summarizing the interviews with Jarrod[10] and Amy, Dr. Simoneaux stated the following:

> It seems that Amy is rather inconsistent in some of her reports. On the one hand, she said that Jarred is a good father and she has no doubt that he loves these children. On the other hand, she describes him as being rigid, unemotional, and said that he does not really know the children very well. She believes that she can provide the most stability for these children, even though she expressed some displeasure about living in her mother's home, and she was inconsistent in reporting about the stability of her relationship with her current husband. On the one hand, she said that they are getting a divorce. On the other hand, it is clear that she still loves him and still has contact with him. In fact, she has the children call him "Daddy Ray."

> Psychological testing on Jarred indicated that he seems to be a rather stable individual. If he has the traits identified by Amy, that is being rigid, unaffectionate, etc.; those traits are not evident on the psychological testing. Amy claims that he was unfaithful with her in their marriage. Of course, she reconciled with him despite this infidelity. She has been involved with a couple of other people. They both are married, and I saw no evidence of any gross immorality on the part of either that would affect this child. Jarred's psychological testing and the results of the interview proved him to be a fairly stable, concerned parent. The largest concern I have about Jarred has to do with the fact that he is very negative regarding Amy, though some of his criticisms appear to be valid. I also have concerns, however, about his present wife. Amy makes some provocative statements about her, claiming that she is both obsessive compulsive and noting that she has been engaged in serious harassment of Amy. Even though Jarred said that his wife would participate in a psychological evaluation if needed, she refused when that evaluation was indicated. I do not know her, and cannot comment about whether or not she serves as a positive or negative force.

> Similarly, Amy's current husband is a huge question mark. He is in prison. Amy clearly is minimizing his legal entanglements. She gives inconsistent reports about her future with this man, saying on the one hand that they are divorcing, but on the other hand, clearly indicating strong affection for him. This probably is indicative of the kind of personality characteristic Jarred worries about. Psychological testing

---

[10]In this report, Dr. Simoneaux misspells Jarrod's name as "Jarred."

supported the idea that Amy's relationship with men is going to be tenuous and tortured. That certainly seems to be the case.

If this case is viewed simply from the standpoint of who can provide the most stable, traditional family environment for these children that clearly appears to be Jarred. Jarred is in a marital relationship, he has a stable job, and seems to have a stable residence. The biggest complaint that Amy has about Jarred involves different approaches to parenting. She implied that Jarred could be rigid to the point of being abusive, and I saw no evidence for that. Even though Jarred does seem to have a fairly stable lifestyle, and he has gone through great efforts to ensure that he is a part of this child's life, there are big question marks about Jarred, particularly related to his present wife. For the most part, however, with the information that I have available to me, it appears that Jarred is capable of providing some degree of stability and maturity. I have no doubt that he loves these children. I see no evidence that Jarred would be abusive or neglectful in any way. I am concerned about his ability, however, to support and encourage the children's relationship with Amy. If he were designated as the primary domiciliary custodian, it would be necessary to ensure, though the court's insistence, that he continue to be as supportive of Amy's relationship with the children as possible.

Amy loves these children, but she seems to be more focused on her despair rather than the children's best interest. She is inconsistent and confusing. While she allows that the children need a relationship with their father, and in one breath says that Jarred is a good father, and the next breath she is complaining about him, his wife, etc. She acknowledged that she is quite distressed when she does not have the children in her care, but at the same time she indicates that the children do need a relationship with their dad. She has involved them very strongly in her current husband, who is now in jail. Further inconsistencies are noted when she talks about her current living situation. On the one hand, she seems appreciative of the fact that she has her mother's support and that she is able to live in the mother's home. Amy is not working and says that she has devoted full time to her role as a parent. On the other hand, she indicated that she is not completely happy with a lack of autonomy. I fail to identify any substantive plans that she has for resolving this dilemma. Amy does not appear to be particularly happy or satisfied. She imagines herself and her life to be a certain way, but she is not always consistent or accurate in those descriptions. Psychological testing does indicate that Amy has some difficulties and that Jarred's concerns about her stability are probably well placed. Amy is certainly more unpredictable and mercurial than is the case with Jarred. Again, I have no doubt that Amy loves these children, and I do not believe she would bring any harm to the children. Some of Jarred's concerns, however, about her emotional instability seem to be valid.

10

I do have some missing information, so these recommendations should be rather tenuous. For example, I have relatively little information from either attorney in support of the litigant's claims. Additionally, the current spouses of both of these individuals is a big question mark. I would also assume that Amy's mother is a strong and positive force in this child's life. I did not evaluate Amy's mother, though she is a significant parent figure. I trust, since the court apparently trusted Ms. Metcalf's mother, that she is a positive force. Further, I heard relatively little from Jarred to indicate otherwise.

In light of the rather limited information that I have, it does appear that Jarred may be able to provide the most consistent and stable environment to this child. I say that, however, with some degree of caution. Additional information could certainly change this recommendation. Jarred enjoys the advantage of a stable, legally committed relationship with his wife. He has good job stability, and seems to be a mature force. He clearly has demonstrated an interest in serving the best interest of his children. I do think he needs some help, however, in learning how to be encouraging of the mother's relationship with the children, despite his reservations. Working with a childcare professional may help him in this regard. Purely on the basis of his ability to provide this kind of stability and consistency, it would seem that Jarred is best suited to serve as a primary domiciliary custodian. This will be necessary once the children reach school age, as the two week/two week split will not be possible. If the court does order Jarred to be a primary domiciliary custodian, then he should be entrusted with the responsibility of ensuring that these children continues to have a close and enduring relationship with their mother and the extended maternal family.

Amy does have some problems, most of which are related to her future. Amy is living with her mother and I am sure her mother would allow her to stay there interminably. Her mother is obviously very close to these children as well. Amy has a tenuous relationship with her husband; she has no job, and no means of support apart from her mother. She has personality characteristics that probably need to be resolved. Amy would do well to enter therapy with a skilled therapist who could help her resolve some of these difficulties. I think Robin Miley would be a good choice as a therapist for Amy. I do think she needs extensive time with her children and since Jarred lives in another state, she is probably going to need some help from Jarred in facilitating communication and transportation. I would urge that the court consider giving her very liberal visitation, upwards of three weekends a month, including the majority of most holidays and summers. She has been the primary caregiver, along with her mother, and the children need to maintain a relationship with her. It would not be excessive for her to have daily telephone or Internet communication with these children as well.

> Above all, these parties need to learn to communicate with regard to the children's welfare. Ms. Miley could also be an important force in helping them learn how to co-parent these children despite the distances between them. There is no doubt that they both love these children and they both want what's best for the children. The children do need, however, stability and predictability in their lives. I would hope the court could settle this now, so that the children could move on as they start school.

Dr. Simoneaux's report concerning his interview with Jeanna did not change this summary to any significant degree. Dr. Simoneaux noted that "the children feel more comfort in Amy's home" and "[t]hey seem to feel closer to their mother and grandmother" and recognized as a positive the facts that Amy was not working and that she and her mother were both primary caretakers of the children. However, Amy testified at the hearing that she plans to get a job and move out of her mother's home. Dr. Simoneaux emphasized that this is a very close case. In his final report Dr. Simoneaux did suggest that Amy be the primary domiciliary parent, but only with some conditions being placed on that recommendation: "assuming that Amy has maintained her sobriety, she has developed some stability with regard to her lifestyle, and she does attend the counseling that I suggested." At the hearing, Amy said that she had looked for jobs and possible places to live but had left her life on hold pending the outcome of the hearing, and stated that she did not need any therapy.

As previously stated, an award of custody is based on the best interests of the children. La.Civ.Code art. 131. When parents cannot agree to a custody arrangement, La. Civ.Code art. 134 provides twelve nonexclusive factors that the court shall consider in determining the best interest of the child. While the trial court did not state for the record that it considered these factors, we find that the analysis of these factors support the trial court's custody judgment. The factors are:

12

(1)  The love, affection, and other emotional ties between each party and the child.

(2)  The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3)  The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4)  The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5)  The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6)  The moral fitness of each party, insofar as it affects the welfare of the child.

(7)  The mental and physical health of each party.

(8)  The home, school, and community history of the child.

(9)  The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10)  The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11)  The distance between the respective residences of the parties.

(12)  The responsibility for the care and rearing of the child previously exercised by each party.

Both the first and second factors balance equally between the parties because there is no question that both parents love their children and would do their best to further their educations.  The third factor balances in favor of Jarrod, based on his testimony that Amy had neglected both potty-training Ethan and his dental hygiene.  The fourth factor does not favor either parent, as the record before us demonstrates that the children have not had a secure, consistent, stable environment since the divorce.  The

13

fifth and sixth factors weigh heavily in favor of Jarrod when one compares his relationship with his current wife against Amy's relationship with her incarcerated former husband. Jarrod and Jeanna have been married for over two years at the time of the hearing and were raising Jeanna's teenage son together. Amy, by contrast, had married a man who was incarcerated in prison, then divorced him because the judge and her attorney informed her it was in her children's best interest to do so. Neither the seventh, eighth, or ninth factor is relevant in this case, as both parties appear to be in good health, the children are too young to have home, school, or community histories, and the children are also too young to express a preference about their custody arrangements. The tenth factor does not favor either party as the procedural history in this case, the parties' testimony at the hearing, and Dr. Simoneaux's reports show that neither party has been willing to encourage the children's relationship with the other parent. The eleventh factor, the distance between the parties' residences, favors having one domiciliary parent with the other receiving reasonable visitation on weekends and holidays, rather than a split of equal time. Finally, the twelfth factor weighs in favor of Amy, as she appears to have been the children's primary caretaker before the divorce and was awarded their sole custody, with Jarrod being given phased-in visitation, by the Ohio court.

Further, at the hearing, although Jarrod stated that he would encourage their children's relationship with Amy if he were designated their domiciliary parent, he qualified that statement by saying "I think that if [Amy] will get cleaned up and go to rehab and get a job and a place to live, I have no problem with her seeing them as often as she wants to on those conditions." Additionally, in his February 6, 2009 report, Dr. Simoneaux stated that the "largest concern [he had] about Jarred [sic] has

14

to do with the fact that he is very negative regarding Amy, though some of his criticisms appear to be valid." Still, in his February 6, 2009 report, Dr. Simoneaux suggested that Jarrod could "provide the most stable, traditional family environment for these children . . . Jarred [sic] is in a marital relationship, he has a stable job, and seems to have a stable residence."

Reviewing the testimony and evidence presented at trial in light of the factors provided in La.Civ.Code art. 134, we find that the trial court did not clearly abuse its discretion in concluding that the children's best interests were served by changing the Ohio court's custody award, granting the parents joint custody, designating Jarrod as the domiciliary parent, and providing Amy with reasonable visitation.

## DISPOSITION

For the foregoing reasons, we affirm the trial court's judgment in all respects. We assess all costs of this appeal to Amy Goldberg.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.